# Immuno AG., Respondent, v J. Moor-Jankowski, Appellant.

First Department, January 17, 1989

## APPEARANCES OF COUNSEL

*Raymond S. Fersko* of counsel *(Anders R. Sterner, Mitchell Lapidus* and *Cynthia J. Leinwand* with him on the brief; *Tanner Gilbert Propp & Sterner,* attorneys), for respondent.

*Robert G. Sugarman* of counsel *(Philip A. Byler* and *Kenneth L. Bressler* with him on the brief; *Weil, Gotshal & Manges,* attorneys), for appellant.

*Michael S. Zachary* of counsel *(Moses & Singer,* attorneys), for New York Civil Liberties Union, *amicus curiae.*

*Henry R. Kaufman* for World Wildlife Fund, *amicus curiae.*

*Laura M. Mattera* for Sierra Club and others, *amici curiae.*

## OPINION OF THE COURT

MURPHY, P. J.

This libel action was commenced in December 1984 against numerous defendants only one of whom, the appellant Dr. Jan Moor-Jankowski, has managed to remain in the action to seek a determination on the merits.

The plaintiff, Immuno AG. (hereinafter Immuno), is an Austrian-based corporation with related corporate entities in some 30 countries. Immuno manufactures biologic products derived from blood plasma. These products are tested for safety and efficacy on chimpanzees, the only primates suitable for such purposes.

Defendant Moor-Jankowski is a universally acknowledged authority on the use of primates in biomedical research. He is

professor of medical research at the New York University Medical School and director of New York University Medical School's Laboratory for Experimental Medicine and Surgery in Primates (LEMSIP). He is also director of the World Health Organization Collaborating Center for Hematology of Primate Animals and the editor-in-chief of the Journal of Medical Primatology.

In December 1983, Moor-Jankowski caused to be published in the Journal of Medical Primatology a letter to the editor by Dr. Shirley McGreal.[1] Dr. McGreal is the chairwoman of the International Primate Protection League (IPPL). The IPPL is an organization which has advocated strenuously, and often effectively, for the humane treatment of primates, particularly those used in biomedical research. Dr. McGreal's letter was sharply critical of a proposed plan by plaintiff Immuno to build a medical research facility in the West African nation of Sierra Leone. The text of the letter follows:

### "A Project with Potential to Spread Non-A/Non-B Hepatitis in West Africa

"The International Primate Protection League has learned with concern of proposals submitted by Immuno AG Company of Austria to the Government of Sierra Leone, West Africa, regarding the company's plans to establish a chimpanzee research facility in Sierra Leone, West Africa.

"According to a statement dated August 23, 1982 submitted to the Government of Sierra Loene by Klaus Bieber, Austrian Consul in Sierra Leone, the animals would be used in hepatitis non-A, non-B research and testing of hepatitis B vaccine. The purpose of establishing the facility in Africa was stated to be 'to avoid the problems involved with the importation of live chimpanzees.' Presumably, these 'problems' include national and international laws and treaties regarding the movement of live animals belonging to endangered species. The chimpanzees *Pan troglodytes* is listed in Appendix I of the Convention on International Trade in Endangered Species.

"Besides getting round restrictions on the international movement of chimpanzees, cheapness of wild-caught chimpanzees appears to be a motivating factor for the Immuno Company. According to the Austrian newspaper *Presse* (February 3, 1983), Immuno Official Johann Eibl stated that captive

---

1. Dr. McGreal is not a medical doctor. She has a D.Ed. degree.

breeding of chimpanzees was not an economically viable proposition.

"The proposed facility would procure 60-80 chimpanzees per year, to be obtained from the wild. However, according to Bieber's statement, 'it must be emphasized that the research will not bring about a decimation of chimpanzees: on the contrary, their numbers would remain stable.' Readers familiar with the destructive method by which chimpanzees are caught (killing of mothers in most cases) may be surprised at this statement. However, Bieber cheerfully explains the non-detriment theme by saying, 'Because, after going through a research circle of about 3 years, the animals will be in perfect condition and ready for rehabilitation into the wild.'

"The International Primate Protection League is concerned over Immuno's plans on many grounds; to cite just a few of them:

"1. Release of chimpanzee 'veterans' of hepatitis non-A, non-B research would be hazardous to wild populations, as there is no way to determine that an animal is definitely not a carrier of the disease. Should release of carrier animals occur, hepatitis could well spread among wild chimpanzees over large parts of Africa. Thus chimpanzees could well become a reservoir for hepatitis just as bats are a reservoir for rabies. The result might be increased human persecution of chimpanzees.

"2. Although chimpanzee rehabilitation has acquired a certain 'chic,' it is well known that wild chimpanzees attack introduced newcomers. For this reason, chimpanzees in the Mount Asserik project in Senegal directed by Stella Brewer had to be recaptured and released on islands in the River Gambia with no resident chimpanzees. As yet, no permanent home has been located for these animals. The rehabilitation procedures take many years per animal and are extremely costly and hence not feasible on the scale that would be required to start 60-80 animals per year on rehabilitation. Assuming a 5-year training per animal, there could be up to 400 animals undergoing rehabilitation at any given time, at the cost of millions of dollars annually. It is questionable whether, in spite of the most dedicated efforts, any rehabilitated chimpanzees will become totally normal, since they are usually removed from the wild at 1-2 years of age and thus miss the most critical years of their social development.

"3. Capture of wild chimpanzees for research is in clear violation of the World Health Organization's 1982 statement

on the procurement of primates for biomedical research. Chimpanzees are listed in the Red Data Book of the International Union for the Conservation of Nature as 'vulnerable.' The WHO statement 'strongly recommends' that endangered, vulnerable, and rare species be considered for use in biomedical research projects only if they are obtained from *existing* [emphasis added] self-sustaining captive breeding colonies (i.e., captive-breeding all animals required to at least the F-2 generation).

"4. Currently, there are over 1000 chimpanzees in US laboratories, as well as large numbers in the Netherlands, Poland, Liberia, etc. These animals should be enough to supply any legitimate requirements for chimpanzees.

"The International Primate Protection League shares the scientific community's concern over hepatitis. However, we feel that a way can and must be found to solve this problem without recourse to the dwindling populations of wild chimpanzees. Therefore, we appreciate the opportunity to draw this situation to the attention of interested parties.

"Shirley McGreal, MD
Chairwoman
International Primate
 Protection League
P.O. Drawer X
Summerville, SC 29483".

The letter was prefaced with an editorial note by Moor-Jankowski explaining the circumstances under which it had come to be published. A draft of the McGreal letter had first been received by Moor-Jankowski in January 1983. Shortly thereafter, in February 1983, Moor-Jankowski sent a copy of the draft letter to Dr. Hans Eibl of Immuno, requesting comments or a reply letter. Immuno referred the matter to its New York attorneys who wrote Moor-Jankowski in March 1983, demanding access to the documents upon which McGreal had relied in composing her letter and threatening legal action if the letter was printed before an opportunity for meaningful response was provided. Moor-Jankowski refused Immuno's request for McGreal's source material, but extended the deadline for a response from Immuno until April 20, 1983. The letter was eventually published in December 1983, nearly a full year after receipt of the draft, and after articles had appeared in the Austrian press apparently confirming much of what McGreal said.

Prior to publication of the McGreal letter, in October 1983, an article entitled "Loophole May Allow Trade in African Chimps" appeared in New Scientist magazine. The article's author, Nancy Heneson, had interviewed Moor-Jankowski concerning the proposed Immuno project and reported that he had condemned the project terming it "scientific imperialism". Moor-Jankowski expressed to Heneson his concern that Immuno's attempt to circumvent treaty restrictions on trade in endangered species would reflect poorly on others, himself included, engaged in biomedical research using chimpanzees. He also offered the view that the World Health Organization (WHO) would soon find it necessary to take a stand on the Immuno project since the project apparently conflicted with WHO policy respecting the use of endangered, vulnerable and rare species in biomedical research. As noted in the McGreal letter, the recommended WHO policy was that members of endangered, vulnerable and rare species were not to be used as research subjects unless they were obtained from "existing self-sustaining breeding colonies". Moor-Jankowski indicated to Heneson that there were enough chimpanzees in captivity to meet research requirements.

■ It is Immuno's claim in this action that the McGreal letter and the statements attributed to Moor-Jankowski in the New Scientist article are libelous. The claim has been pursued with great vigor, and by the time the present motion by the defendant for summary judgment was submitted the record had grown to over 4,000 pages. After a thorough review of this lengthy record, we conclude that the statements contained in the letter and New Scientist article are not actionable and that the defendant is entitled to summary judgment dismissing the complaint.

The common law of libel provides a plaintiff with a means to recover for injury to reputation caused by statements which are both false and defamatory. Although false, the statements must purport to be factual for expressions of opinion are constitutionally protected and hence nonactionable. (Gertz v Robert Welch, Inc., 418 US 323, 339-349; Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 380; Steinhilber v Alphonse, 68 NY2d 283, 289.)

In denying defendant's motion for summary judgment, the court held, "It is clear that the statements complained of by the plaintiff, if false, are actionable defamations." Necessary to this broad holding was the court's determination that the

statements about which Immuno complained were factual and, therefore, undeserving of the constitutional immunity afforded expressions of opinion. The court observed, "One cannot read the complained-of statements without coming away with the abiding understanding that defendant was making factual charges disparaging plaintiff's scientific activities—*inter alia*, as a fact, defendant was charging that plaintiff was risking a hepatitis epidemic in West Africa, cynically planning to shoot large numbers of chimpanzee mothers at periodic intervals in order to obtain juvenile chimpanzees for its own purposes, and violating through subterfuge, an international conviction for the protection of chimpanzees. It would be playing a game of semantics to endow these factual charges with the cloak of opinion."

We think that the court's analysis was flawed in several respects. First, we disagree with the court's rather abrupt conclusion that the statements at issue were entirely factual. Although the McGreal letter did contain some assertions of a factual sort, it would seem plain that its ultimate objective was to express certain opinions which, while highly critical of plaintiff's proposal, did not rise to the level of outright accusations of wrongdoing. It was, moreover, the case that the factual assertions upon which McGreal's opinions rested were evidently true; although it had a more than adequate opportunity to do so, plaintiff did not in opposition to defendant's summary judgment motion adduce evidence of falsity sufficient to warrant the motion's denial. Contrary to the assumption which seemed to form the court's opinion, the truth or falsity of the assertions made in the McGreal letter was not a matter necessarily to be reserved for trial. The extensive record before the court indicated quite clearly that plaintiff would not be able to sustain the claim necessary to the proof of its case that the McGreal letter's factual content was false.

It was in *Gertz v Robert Welch, Inc.* (418 US 323, 339-340, *supra)* that Justice Powell writing for the court stated, "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." From this dictum has sprung a considerable body of decisional law in which courts have sought to determine whether allegedly defamatory statements are to be deemed expressions of opinion privileged under the First Amendment, or statements of a factual sort possibly outside the First Amendment's protective scope. *(See, Ollman*

*v Evans,* 750 F2d 970, 974-975, n 6, *cert denied* 471 US 1127; *see also, e.g., Steinhilber v Alphonse, supra; Parks v Steinbrenner,* 131 AD2d 60.) The determination has been thought one best left to the court rather than the jury since, as has been often remarked, the line separating fact from opinion is frequently difficult to discern. *(See, e.g., Steinhilber v Alphonse, supra,* at 290; *Ollman v Evans, supra,* at 978.) Whether language has as its principal purpose the transmission of a viewpoint or purports to represent a true state of affairs depends not only upon the words chosen but upon the context in which they are employed. The task set the court then is a delicate one requiring sensitivity both to literal signification and to the way in which a statement will be understood. To be sure, literal meaning, to the extent it is ascertainable, has a bearing upon the way in which an expression is understood, but the relationship is subject to varying degrees of attenuation depending upon the tone employed by an author or the author's evident use of exaggeration or understatement. While there exists no absolutely definitive test to guide courts in distinguishing what will be understood as opinion from what will be understood as fact, the inquiry has not been thought entirely resistant to analysis. Indeed, the inquiry has been committed to the courts precisely because it is one requiring an analytic approach if it is to be addressed with some measure of consistency and predictability. *(See, Ollman v Evans, supra,* at 978.) It must not be forgotten that in articulating the boundaries separating fact from opinion courts concern themselves not with a narrow semantic inquiry but with one having a profound constitutional dimension; we determine no less than what may and, to a degree, what may not be freely said. In a society such as ours dependent upon and committed in a fundamental way to the free exchange of information and ideas, it is vitally important that those who would speak and write not be deterred from doing so because of uncertainty over whether they will come within the First Amendment's protective ambit. It is then generally agreed that in sorting fact from opinion courts should employ some analytic criteria and that those criteria should be applied so as not to restrict unduly the range of free expression. *(See, supra,* at 991.)

■ The question ultimately to be answered in assessing whether a statement is one of opinion or fact is how it would be perceived by an average member of the audience to whom it is directed. *(Steinhilber v Alphonse, supra,* at 290; *Parks v*

*Steinbrenner, supra,* at 63.) Although, as noted, there is no definitive, universally applicable set of criteria to be employed in addressing this question, courts have found it useful to focus upon the language used to see if it has a precise meaning capable of objective verification. It has also been thought useful to examine the immediate context in which a complained-of statement is presented to ascertain whether the form and content of the communication as a whole would alert the reader or listener to the circumstance that what is being expressed is opinion rather than fact. And, going beyond the statement itself and the immediate setting in which it is presented, courts have considered the broader social context to ascertain the manner in which that context may affect the average reader's or listener's perception of a statement as being either one of fact or opinion. These considerations were the subject of an extensive scholarly presentation by Judge Starr in his well-known plurality opinion in *Ollman v Evans* (750 F2d 970, *cert denied* 471 US 1127, *supra)* and their utility has since been favorably commented on by the Court of Appeals *(see, Steinhilber v Alphonse,* 68 NY2d 283, 292, *supra),* and this court *(see, Parks v Steinbrenner,* 131 AD2d 60, 63, *supra).* While they constitute no more than general guides to inquiry the individual importance of which will vary depending on the facts of each case, they should not be dispensed with lightly, and especially not in favor of a court's subjective sense of what is and is not factual. The question of whether a statement is one of fact or opinion is after all to be dealt with as a matter of law and requires in its address the application of some reasonably objective, even if general, criteria. *(See, Ollman v Evans, supra,* at 978.)

It would seem that the universe of expression has been divided for the purposes of libel law analysis between the realms of fact and opinion. Although opinion enjoys absolute constitutional immunity, statements of a factual sort do not. Nevertheless, liability for a defamatory statement of fact is not automatic; a true statement cannot be the basis for a libel plaintiff's recovery. Truth is, of course, a principal object of discourse in a free society its ascertainment being indispensable to the beneficial exercise of individual, but even more importantly, collective judgment. Indeed, there can be no doubt that the right of the public to know what is true must take precedence over an individual's right to recover for a damaging remark. What has been more controversial is who should bear the burden of proving truth or the lack of it.

Although it was the case at common law that good repute was presumed as was the falsity of a statement damaging to a person's name, and that it was therefore left to the defendant to prove as an affirmative defense that the complained-of statement was true *(see, e.g.,* Prosser, Torts § 116, at 798 [4th ed]; 1 Seelman, Libel and Slander in New York, ¶¶ 170, 392 [rev ed]), there are certain kinds of cases in which that is no longer the rule. The demise of the common-law presumption of falsity may be traced to *New York Times Co. v Sullivan* (376 US 254) where the Supreme Court held that a public official may not prevail upon a defamation claim unless the defendant's actual malice is demonstrated with convincing clarity *(supra,* at 283; *see also, Garrison v Louisiana,* 379 US 64; *Curtis Publ. Co. v Butts,* 388 US 130). Implicit in the *New York Times* holding was the requirement that the public figure plaintiff prove falsity, for the actual malice standard entailed a showing of the defendant's calculated use of falsehood. As this State's Court of Appeals observed, "[a]lthough there has been doubt * * * the burden is now on the libel plaintiff to establish the falsity of the libel. *(Cox Broadcasting Corp. v Cohn,* 420 US 469, 490.) This requirement follows naturally from the actual malice standard. Before knowing falsity or reckless disregard for truth can be established, the plaintiff must establish that the statement was, in fact, false." *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380, *supra.)*

In *Gertz v Robert Welch, Inc. (supra,* at 345), of course, the Supreme Court recognized that the States retained "substantial latitude" to prescribe the level of culpability necessary to sustain a libel action brought by a private figure plaintiff, thereby permitting such a plaintiff to prevail on something less than a showing of actual malice. The New York Court of Appeals exercised this "substantial latitude" in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196) stating, "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *(Supra,* at 199.) Although *Chapadeau* allowed a private figure plaintiff to recover upon a showing of fault less demanding than that

126

constitutionally required of public figure plaintiffs, New York
courts held that the standard of culpability articulated in
*Chapadeau,* i.e., gross irresponsibility, still necessitated the
plaintiff's proof of falsity: "We see no significant distinction
where the plaintiff is held to be a private figure and the topic
of the article is a matter of public concern. In such cases the
plaintiff is required to prove gross irresponsibility * * * result-
ing in a defamatory falsity. Under such circumstances, proof
of falsity is again naturally related to the standard of care.
Thus, in a case with constitutional implications such as the
one at bar, the defamed plaintiff must prove falsity, irrespec-
tive of his status (see *Wilson v Scripps-Howard Broadcasting
Co.,* 642 F2d 371)." *(Fairley v Peekskill Star Corp.,* 83 AD2d
294, 297.) That this approach was correct and, indeed, consti-
tutionally mandated, at least where media defendants were
concerned, became apparent after the decision of the Supreme
Court in *Philadelphia Newspapers v Hepps* (475 US 767).
There, the court held "the common-law presumption that
defamatory speech is false cannot stand when a plaintiff seeks
damages against a media defendant for speech of public
concern." *(Supra,* at 777.) Recognizing that there would be
cases in which a media defendant might have great difficulty
proving the truth of a statement even though it was in fact
true the court observed, "placement by state law of the
burden of proving truth upon media defendants who publish
speech of public concern deters such speech because of the
fear that liability will unjustifiably result. * * * Because such
a 'chilling' effect would be antithetical to the First Amend-
ment's protection of true speech on matters of public concern,
we believe that a private-figure plaintiff must bear the burden
of showing that the speech at issue is false before recovering
damages for defamation from a media defendant. To do other-
wise could 'only result in a deterrence of speech which the
Constitution makes free.' *Speiser [v Randall,* 357 US 513,]
526." *(Supra,* 475 US, at 777.)

There is no question that the present defendant is a
media defendant, nor is there question that the speech at
issue is at least "arguably within the sphere of legitimate
public concern" *(Chapadeau v Utica Observer-Dispatch, supra,*
at 199). Plaintiff concedes as much when it urges that it is a
"private figure, subject to the 'grossly irresponsible' standard,"
thus acknowledging the existence of conditions warranting
*Chapadeau's* application to the facts at bar. But even if the
concession had not been made, we would have no difficulty

finding that the McGreal letter contained speech of public concern. Plainly, the plans of a party to undertake a course of activity which would possibly frustrate efforts of the international community to safeguard an endangered species are of public concern. This and the media status of the defendant being beyond dispute, *Philadelphia Newspapers (supra)* dictates that plaintiff must prove that the defamatory statements are false if it is to prevail.

The allocation of the burden of proof dictated by *Philadelphia Newspapers (supra)* has the consequence that a libel plaintiff opposing a motion for summary judgment must come forward with proof in evidentiary form sufficient to generate a triable issue as to the offending statement's falsity. If no such proof is offered, the defendant is entitled to prevail. *(See, Rinaldi v Holt, Rinehart & Winston, supra,* at 382; *Pollnow v Poughkeepsie Newspapers,* 67 NY2d 778, 779; *see also, Brady v Ottaway Newspapers,* 84 AD2d 226, 242-243; *Fairley v Peekskill Star Corp., supra,* at 297.)

■ The importance of summary adjudication in the context of libel litigation cannot be overemphasized. Libel actions are notoriously expensive to defend and, indeed, "[t]he threat of being put to the defense of a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself". *(Washington Post Co. v Koegh,* 365 F2d 965, 968 [J. Skelly Wright, J.], *cert denied* 385 US 1011.) While the threat of defamation actions cannot be eliminated so long as States consistent with their traditional and worthy concern for personal reputation continue to afford victims of libel and slander civil recourse, it has been thought desirable and necessary to the ends served by the First Amendment to limit the circumstances under which recovery may be had and, in so doing, to encourage pretrial disposition of all but those lawsuits involving defamatory speech susceptible of being proved false, culpably uttered and damaging. Thus, the cases following in the wake of *New York Times* and *Gertz (supra)* have mandated the summary dismissal of libel actions based on nonfactual statements and have, through the imposition of stringent standards of fault and the reallocation of evidentiary burdens on the issue of falsity, rendered libel actions—particularly those involving speech of public concern and public figure plaintiffs—ever more vulnerable to early dismissal. Whether these constitutionally based limitations upon the availability of a remedy for defamation have been successful in diminishing the threat posed free expression by

proliferating lawsuits is a subject of ongoing debate. It is, however, certain that if their motions for summary judgment are erroneously denied, libel defendants will not be substantially better off than they were at common law before the era of First Amendment jurisprudence ushered in by *New York Times Co. v Sullivan (supra)*. To unnecessarily delay the disposition of a libel action is not only to countenance waste and inefficiency but to enhance the value of such actions as instruments of harassment and coercion inimical to the exercise of First Amendment rights. Thus it has been recognized that "[i]n the First Amendment area, summary procedures are even more essential [than other kinds of litigation]. For the stake here, if harassment succeeds, is free debate." *(Washington Post Co. v Koegh, supra,* at 968.) For this reason the courts of this State have repeatedly instructed against reluctance in the application of the ordinary rules governing summary judgment in libel cases. *(See, e.g., Karaduman v Newsday, Inc.,* 51 NY2d 531, 545; *Gaeta v New York News,* 62 NY2d 340, 351; *see also, Rinaldi v Holt, Rinehart & Winston, supra,* at 384; *Freeze Right Refrig. & Air Conditioning Servs. v City of New York,* 101 AD2d 175, 181.)

That the motion court in this case was evidently reluctant to apply the ordinary summary judgment criteria, and apparently indicated its indisposition even to entertain a summary judgment motion is regrettable. It is disturbing that the plaintiff had, by threatening legal action, managed to delay publication of the McGreal letter for almost a year, and that it succeeded in coercing what the motion court referred to in its decision as "substantial settlements" from all but one of the original defendants for the obvious reason that the costs of continuing to defend the action were prohibitive. It is, however, particularly unfortunate the one remaining defendant was not granted the summary relief to which he was so clearly entitled, for the careful examination of the record required of us, especially in libel actions *(see, Rinaldi v Holt, Rinehart & Winston, supra,* 42 NY2d, at 384), leads unavoidably to the conclusion that none of the statements about which the plaintiff complains are actionable.

Before turning in detail to the substance of the McGreal letter, certain general observations regarding the context in which the letter was published are in order. The Journal of Medical Primatology (Journal) is a publication directed at a highly specialized group of readers. Its subscribers are, almost without exception, medical doctors, researchers, and the medi-

cal and science libraries of academic institutions. The scientific studies published in the Journal are of a formal and technical sort. It must be presumed that those who consult the Journal are not novices in the field of medical primatology and that they bring to their reading a well-developed understanding of the issues facing biomedical researches using primates as research subjects. Aside from their specialized knowledge, the Journal's readers, a group largely comprised of those with advanced scientific training, must be presumed skilled in the dispassionate evaluation of information and argument.

■ McGreal's remarks were presented to this sophisticated readership in the relatively modest format of a letter to the editor; there was absolutely no attempt to vest the letter's contents with the trappings of objectivity and authority reserved in other parts of the Journal for articles presenting scientific findings. The common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion. Surely, this expectation was not defeated in this case. The limited factual basis for Dr. McGreal's conclusions was immediately evident from the letter's text, and indeed it is the hallmark of "pure opinion" that it is accompanied by a recitation of the facts upon which it is based. *(See, Steinhilber v Alphonse, supra,* 68 NY2d, at 289; *see also,* Restatement [Second] of Torts § 566, comments b, c.) This is because when stated facts are merely supportive of and do not require a conclusion, it must be thought that the conclusion is in the nature of comment or opinion; the claim made is not that the comment must be true, but that it represents the view most persuasively justified by the facts at hand. It would have been particularly evident to the Journal's readers that McGreal's conclusions as to the advisability of the Immuno proposal were no more than opinions. Certainly, the Journal's readers would not have confused her predictive assertions respecting the risks of the Immuno proposal for matters of fact.

The editorial note preceding the letter underscored the circumstance that the views expressed in the letter were McGreal's and the letter itself repeatedly spoke in cautious terms of its author's "concerns". It was moreover clear that McGreal's concerns were those of an animal rights activist. The letter and the prefatory editorial note both drew the reader's attention to the fact that McGreal was chairwoman

of the International Primate Protection League. In this capacity she had become well known as a staunch advocate for strict limitations on the use of primates in biomedical research. The Journal's readers were well aware of this. Indeed, some of them, defendant Moor-Jankowski included, had been past targets of her criticisms. They would have understood that Dr. McGreal's comments as to the advisability of a research project such as that proposed by Immuno were likely to reflect in some measure her general inclination to look askance at proposals for research involving chimpanzees. The debate between animal welfare activists and proponents of research involving animals as research subjects had been underway for years at the time the McGreal letter was published. It was a debate whose tone had not always been moderate and in the course of which exaggerated pronouncements were not uncommon; the rhetoric often belied the complexity of the underlying scientific and ethical issues. Had Dr. McGreal actually made factual charges of the sort the motion court thought would be understood from her letter *(see, supra,* at 118-120), we think that they would, in light of the tone of the larger debate, have been viewed as little more than overstatements reflective in considerable part of their author's well-known biases. As it was, however, the letter was, although sharply critical, quite careful to distinguish between fact and comment. That Dr. McGreal's observations upon the cited facts did not reflect well upon Immuno is clear, but that they were her observations and did not purport to be matters of fact is also clear. As such, they cannot support a recovery for defamation. Regarding the underlying factual propositions, as we shall see, those were, on the extensive record before us, either demonstrably true, or apparently insusceptible of being proved false, and in either event nonactionable.

Some factual background is necessary in order properly to evaluate the letter's various assertions.

To begin, it is not disputed that in April 1982, the Austrian government ratified the Convention on International Trade in Endangered Species (CITES). As is here relevant, CITES provides, "The import of any specimen of a species included in Appendix I [chimpanzees are so included] shall require the prior grant and presentation of an import permit and either an export permit or a re-export certificate. An import permit shall only be granted when the following conditions have been met * * * (c) a Management Authority of the State of import is satisfied that the specimen is not to be used for primarily

commercial purposes." Soon after CITES was ratified by the Austrian Legislature, Immuno, which had been conducting its research in Austria using imported chimpanzees, initiated inquiries to establish a research center in Sierra Leone using chimpanzees native to that country's forests.

Klaus Bieber, the Austrian Honorary Consul in Sierra Leone, states in his affidavit that he met with representatives of Immuno in Vienna in July 1982. He was at that time instructed to take all necessary steps on Immuno's behalf to facilitate the establishment of a biomedical research center. For his efforts, it was agreed that Bieber would receive an "honorarium" of $1,000 every six months. Bieber labored in Immuno's behalf for approximately two years. He evidently brought the proposed project to the attention of highly placed Sierra Leone government officials and arranged ministry level meetings at which Immuno's representatives could present their proposal directly to the authorities whose approval was required for the project to go forward. Apparently sensitive to issues of protocol, Bieber notes in his affidavit that he advised Immuno that once the project was approved and underway it would be appropriate to give the Sierra Leone President a "nice gift"; he thought a chandelier would do.

Bieber acknowledges in a letter to Shirley McGreal dated March 8, 1983, that on August 23, 1982, he authored a document describing the proposed Immuno project. The document whose obvious purpose was to explain the project to Sierra Leone government officials is titled "hepatitis Research Institute". It states that the research to be conducted with chimpanzees at the institute would include the development of inactivation procedures for non-A/non-B hepatitis viruses in plasma fractions and the testing of hepatitis B as well as non-A/non-B vaccines. The reason for choosing Sierra Leone as the site for the research facility is frankly set forth: "To avoid problems involved with the importation of live chimpanzees, Immuno AG has decided to set up a research facility in West Africa, as the source of the animals, and Sierra Leone is its first choice." The document then seeks to reassure that the research will not cause the decimation of the wild chimpanzees to be captured and used as research subjects since the animals are to be rehabilitated after a three-year "research circle" and returned to the wild in "perfect condition". According to the document, the proposed research institute's intake will be approximately 60 to 80 chimpanzees per year. Sierra Leone government approval is thus sought "to permit

the company to obtain the necessary number of chimpanzees to carry on research."

Sierra Leone government documents whose authenticity and accuracy are not disputed by Immuno, confirm that the above-described proposal was formally presented to Sierra Leone ministry officials by Immuno representative Gerrald Eder at a meeting held at the Sierra Leone Ministry of Forestry and Agriculture on April 18, 1983. On April 20, 1983, Dr. Abass Bundu, the Sierra Leone Minister of Agriculture, reported to the Secretary to the President on the discussion of the Immuno proposal which had transpired at the meeting two days before. Dr. Bundu explains that the research conducted at the proposed center would seek to "develop inactivation procedures of Non-A/Non-B plasma fractions" and to "prove the potency and safety of the hepatitis B as well as of the Non-A/Non-B hepatitis vaccines." As is here relevant, Dr. Bundu's report went on to indicate that Immuno had asked to be provided with 60 to 80 chimpanzees a year. Dr. Bundu had expressed reluctance to furnish so large a number and proposed instead that Immuno initially be given 50 to 60 animals to begin small-scale research while starting a breeding farm from which it would obtain its supplies in future years. In this connection, Dr. Bundu noted, "[i]ncidentally, the main reason why the Austrians are proposing to establish the centre in Sierra Leone is precisely because they would not otherwise be able to import chimpanzees into Austria by virtue of the Washington Agreement for the Protection of Endangered Species in Flora and Fauna [CITES] to which Sierra Leone and Austria are both signatories." Bundu was skeptical about Immuno's rehabilitation plans observing: "The company had in mind transferring the chimpanzees after the experiment to some isolated uninhabited island for rehabilitation purposes. We did not think this was a sound proposal: first, wild animals domesticated normally do not revert to their natural habitat easily, nor are they usually accepted back by their own kind. In fact their fate is invariably death; second, putting them on an island would be tantamount to founding a new animal colony entirely for the returners—an environment which would certainly not be natural; thirdly, there is the risk of transmission of viruses acquired during the experimentation; and finally there are no isolated uninhabited islands as such since nearly all our islands are frequently visited by artisanal fishermen. For all these reasons, we rejected the idea and

suggested instead that a breeding farm be established by the Centre."

These reservations notwithstanding, Bundu recommended that the project be approved, in principle.

Keeping the above-recounted factual background in mind it is appropriate now to return to the alleged "libel letter" to evaluate the nature of the assertions there made.

■ First, there can be no doubt that the letter accurately reported that Immuno intended to establish a research center in Sierra Leone. The letter also accurately stated the contents of the August 23, 1982 Bieber document describing the proposed project and its objectives. As to the letter's observations concerning Immuno's motives for locating the research center in Sierra Leone, these were not presented as matters of fact but as interpretations of Immuno's conduct justified by certain stated facts. It was, after all, true that the strict import and export restrictions imposed by CITES threatened to cut off Immuno's supply of wild caught chimpanzees for use in its Austrian laboratories. It was also true that Dr. Johann Eibl of Immuno had stated in the Austrian press that captive breeding of chimpanzees was not economically viable. Under these circumstances it was fair to conclude that Immuno wished to get around the CITES restrictions and was situating the facility in Sierra Leone with that purpose in mind. That was, of course, precisely the conclusion drawn by Dr. Bundu after listening to Dr. Eder's April 18, 1983 presentation. Indeed, Dr. Eder in a letter dated January 12, 1983, addressed to Franz Sitter, a renowned, and in some quarters, infamous, chimpanzee dealer with whom Immuno had transacted extensive business, acknowledged Immuno's concerns: "We think that there is hardly any chance that we will be allowed to import the animals necessary for our experiments to Austria before long. There are various reasons for this. On the one hand, the authorities either do not want to permit the importation due to a wrong conception of environmental protection or the respective purviews of responsibility are not clearly defined when it comes to issuing an import permit. On the other hand, the excessive prices charged for chimps call the economic feasibility of this type of venture into question. For this reason we have planned to carry out such a project in Africa itself with the intention that it should be conducted at the highest possible level."

The CITES Secretariat, the international body responsible

for overseeing the treaty's administration, also viewed the plans of Immuno as an attempt to avoid the treaty's trade restrictions. In a letter dated February 15, 1984, the Secretariat stated: "As noted in our letter of 12 October 1983, the project appears to be an attempt to circumvent the restrictions imposed by CITES. Immuno wish *[sic]* to import chimpanzees into Austria but are restrained from doing so by Austria's accession to and implementation of CITES. Thus, the attempt to establish a centre in Sierra Leone can only be reasonably interpreted as an effort to avoid the effects of CITES * * * the project is apparently a deliberate attempt to circumvent the provisions of the Convention."

In any case, the issue before us is not, as it would have been at common law, whether Dr. McGreal's comments concerning Immuno's motives were fair *(see,* Restatement [Second] of Torts § 566, comment b), and it would appear that they were eminently fair, but whether they were statements of opinion, and about that there can be no doubt. Inquiry as to motivation is generally absolutely privileged *(see, Rinaldi v Holt, Rinehart & Winston, supra,* 42 NY2d, at 382), for motivation is ordinarily hidden from view and it is, therefore, understood that most statements concerning motivation do not proceed from certain knowledge but from the observation and interpretation of conduct. The present case is no exception. Dr. McGreal did not pretend to know conclusively why Immuno wished to establish a research facility in Sierra Leone. Rather, she recited certain facts from which she presumed that the motive was avoidance of the CITES treaty's effect. Her presumption did not exclude the possibility of another more benign motivation, it merely indicated that in the absence of contrary facts it was her opinion that the avoidance of treaty restrictions probably figured prominently in Immuno's decision making. As to her statement that "cheapness of wild caught chimpanzees appears to be a motivating factor for the Immuno Company", this description of what appeared to be the case was plainly an expression of opinion justified by statements made to the Austrian press by Immuno official Johann Eibl *(see, infra,* at 136). It may be observed that had Dr. McGreal at the time she composed her letter known all that has been disclosed in the discovery phase of this litigation, she might quite confidently have charged, as a fact, that Immuno wished to avoid the CITES treaty in order to obtain relatively cheap wild caught chimpanzees for its research. These motives

have, of course, been frankly confirmed in the aforecited statements of Immuno officials *(see, supra,* at 131;. *infra,* at 136).

Moving now to the fourth paragraph of the letter, McGreal there asserted that the facility proposed in the earlier-cited August 23, 1982 statement by Consul Bieber would procure 60 to 80 chimpanzees from the wild annually. McGreal then observed that chimpanzees are in most cases captured by killing mother chimpanzees and thereafter taking the surviving juvenile chimps. She noted with evident skepticism that Bieber had claimed that regular removal of so many chimps from the wild would not lead to their depletion since Immuno planned to rehabilitate the chimps after the research cycle was complete and to return. them to the wild in "perfect condition".

■ Immuno takes great exception to McGreal's account of its plans. They note that they eventually agreed not to take 60 to 80 wild chimps annually, but to take only 50 to 60 chimps once to meet their needs during their research facility's first year of operation and thereafter to obtain their supply of chimps from a breeding station which they consented to establish near the research facility. While the evidence indicates that Immuno apparently did alter its original proposal at the insistence of Sierra Leone government officials, it is difficult to perceive how this alteration supports Immuno's defamation claim. There is no question that McGreal's letter accurately recited the specifications of the proposal set forth in the August 23, 1982 Bieber statement. There is also no question that the very same proposal was urged upon the Sierra Leone government by Immuno official Gerrald Eder as late as April 1983. It is also plain that Immuno would have adhered to its original proposal had the Sierra Leone government not insisted upon the above-described concessions. Obviously, McGreal's true report of Immuno's initial proposal, the source and date of which were scrupulously identified by her, cannot support a recovery for defamation.

Particularly perplexing is the claim, implicit in Immuno's argument, that the disclosure of its original proposal was defamatory. It must be stressed that this was Immuno's own proposal. Surely Immuno does not suggest that its very own plan, one which it apparently would have been happy to pursue, was so ill-conceived and so obviously pernicious in its methods and probable consequences that its accurate disclosure caused Immuno reputational injury. If the plan was so clearly misguided the wound which its disclosure is alleged to

have caused is self-inflicted and cannot be redressed through the law of libel.

At most, Immuno can claim only that McGreal failed to indicate in her letter that certain Sierra Leone government documents showed that as of April 1983 the original plan had evidently been superseded by one reflecting modifications required by Sierra Leone ministry officials as a condition of recommending the project's approval "in principal". The omission of this information from McGreal's letter was not defamatory. McGreal's criticisms had as their identified target the original proposal. The letter made no claim that the proposal criticized was the most current plan under consideration.

There was, moreover, good reason for both McGreal and Moor-Jankowski to believe that the original plan had not, despite Immuno's apparent concessions, been conclusively abandoned. In January 1983, the respected Austrian newspaper Die Presse reported concerning the Immuno project: "There seems to be disagreement among the 'fathers' of the project as far as the breeding of chimpanzees is concerned: While General Consul Harrer confirms that the research institute will also include a breeding station, Immuno's director, Eibl, points out the almost unsurmountable difficulties that prevent a profitable breeding of these animals. According to him, the needed chimpanzees shall all be taken from the wild."

Obviously, there was cause to doubt that Immuno would in April 1983 easily abandon its intention to obtain its chimps exclusively from the wild, in favor of a breeding plan which Immuno's director, Eibl, had so recently rejected out of hand as fraught with "unsurmountable difficulties". The difficulties with the breeding plan were indeed profound, for as the expert testimony in the record demonstrates with virtual unanimity, the 50 to 60 wild caught juvenile chimpanzees with which Immuno under its revised plan proposed to start its research and breeding would not reach breeding age for about 10 years.[2]

---

2. The following deposition testimony by Dr. Alfred Prince, a noted expert in the captive breeding of chimpanzees is particularly revealing:

"Q If you had been told that Immuno did not plan to obtain 60 to 80—if you had read in the letter to the editor of Shirley McGreal, not that Immuno was planning to obtain 60 to 80 chimpanzees in the wild in Sierra Leone, but rather that it was planning to start the center with 50 to 60 chimpanzees, which the government of Sierra Leone would give it, and then start a breeding colony, would you have a different opinion as to intelligence [of the plan]?

Doubts about Immuno's ultimate intentions were also warranted by Immuno's failure publicly to renounce the earlier plan. Indeed, the defendant provided Immuno with an opportunity to clarify its intentions and to correct any misimpressions which the McGreal letter might create. Thus, shortly after receiving the letter, Moor-Jankowski, in February 1983, forwarded a copy of it to Eibl with a cover letter which read in pertinent part:

"I would appreciate receiving your comment or reply. Depending on what we hear from you we will either publish Dr. Shirley McGreal's letter together with your comments or, if the allegations in her letter can be proved to us to be incorrect we will return the letter to Dr. McGreal declining its publication.

"The Editors-in-Chief of the *Journal* consider this matter of highest importance in view of the past results of interventions by Dr. McGreal whose visits and negotiations with the former Prime Minister of India, Mr. Desai, resulted in the ban on rhesus monkey exportation which she was able to maintain with Mrs. Indira Gandhi. Dr. McGreal is also credited with the ban on rhesus exportation from Bangladesh. She has successfully interfered with primate animal programs which she considered inhumane in several laboratories both at universities and at NIH. Thus, we cannot take lightly the enclosed letter and I have to ask you to be kind enough to reply so that I may have your response within one month, i.e. before the 10th March as I will not be able to delay the publication of her letter without due cause. It is the policy of the *Journal* to allow all the concerned parties to take a position in a controversial matter."

Eibl responded on February 22, 1983. He acknowledged receipt of the draft letter but made no attempt to address its content. Rather, he urged the editor-in-chief of the Journal of Medical Primatology to seek Moor-Jankowski's unbiased advice, observing that Moor-Jankowski as head of LEMSIP had "vast experience" in the field of medical primatology and was well aware of its problems. (Eibl was apparently unaware that

---

"A No, certainly not. * * *

"A That would be even more unrealistic. The government of Sierra Leone has no chimps. Dr. Sitter can obtain chimps and would be the person to obtain chimps for him. He would obtain little babies. They would then have to wait 10, 12 years until they began to get a trickle of offspring, a very expensive proposition, and it wouldn't satisfy their needs."

Moor-Jankowski was the editor-in-chief of the Journal of Medical Primatology.) Referring to the "non-scientific side" of the draft letter, Eibl indicated that that would be brought to the attention of Immuno's New York attorneys.

Less than two weeks later, on March 3, 1983, Immuno's New York counsel wrote to Moor-Jankowski demanding copies of McGreal's source documents. Counsel claimed that no response to the draft letter could be given by Immuno until it had seen the materials upon which McGreal had relied for her information. Immuno's attorneys threatened to take legal action if the letter was published without an opportunity for "meaningful response".

By letter dated March 22, 1983 Moor-Jankowski replied to the March 3 letter. He refused the document request but extended the time for Immuno to submit a response to the draft letter until April 3, 1983. He noted, "I may add that I am astonished by your request in that matter which is not usual in dealing with source material of the press in this country. Moreover, the contention of Dr. McGreal has been reported and confirmed in the Austrian press."

On April 11, 1983, Immuno's attorneys responded to Moor-Jankowski's March 22 letter, again claiming that their client was unable to frame a proper response to the McGreal draft letter without access to its author's source documents. The threat to take legal action if the letter was published was repeated.

As can be seen, though it was afforded what must be regarded as a generous opportunity to clarify its plans, Immuno never did so. Even after it had allegedly changed its initial proposal in April 1983, it made absolutely no effort to confirm that circumstance to Moor-Jankowski prior to the McGreal letter's December 1983 publication. It is well to recall that "[T]he first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation." (Gertz v Robert Welch, Inc., supra, 418 US, at 344.) Having entirely failed to pursue this "first remedy" which was made so extraordinarily available to it, Immuno is not now in a position to complain. It has, in any event, little to complain about; there has been no lie or error, but merely an apparent, and, under the circumstances, understandable failure by the defendant to present Immuno's research plans in their most current form. We note that Immuno's excuse for

failing to avail itself of the opportunity to respond, namely, that it could not frame a proper reply without access to McGreal's source material, is nonsensical. No one knew better about Immuno's plans than Immuno itself. If McGreal's assertions were in error or were not current Immuno was in no way disabled from indicating that by its lack of access to McGreal's source material.

The fact which an honest reply from Immuno would have been powerless to alter was that, as the McGreal letter reported, Immuno had entertained and actively promoted a most problematic plan. With the evident purpose of circumventing an international treaty, it had approached the Sierra Leone government and requested to be supplied yearly with 60 to 80 chimpanzees for its research purposes. It has not been seriously disputed in the course of this litigation that, as Dr. McGreal stated, chimps are most often caught by killing their mothers, and it has been estimated that for every juvenile chimp captured, 5 to 10 mothers are killed. Even Immuno acknowledged that its original plan without any ameliorative measures might lead to a further depletion of the already endangered West African chimpanzee population and for this reason proposed to rehabilitate the chimps and return them to the wild. Unfortunately, as Dr. McGreal pointed out, this was not a viable option. Previous attempts to rehabilitate chimpanzees such as the Mount Asserik project in Senegal were very costly and had not been highly successful; there was little reason to suppose that an attempt would succeed in Sierra Leone. Dr. Bundu, it will be recalled, had succinctly summarized the many difficulties standing in the way of a rehabilitation project such as the one proposed by Immuno *(see, supra,* at 132-133), not the least of which was the lack of an appropriate site in Sierra Leone. Indeed, a review of the record fails to disclose any real controversy over the unfeasibility of Immuno's originally proposed plan to return the chimpanzees to the wild.

Although vigorously maintaining that its rehabilitation plan had been abandoned by the time of the McGreal letter's publication, Immuno nevertheless is understandably sensitive to Dr. McGreal's allegation that it contemplated a course of action entailing the risk of the spread of hepatitis. It will be recalled that Dr. McGreal had stated that the release of research veterans "could well" lead to the dissemination of the non-A/non-B virus among the African chimpanzee population, turning the chimpanzees into a reservoir for hepatitis.

The stated basis for this assertion was that there was no test to determine whether an animal was a non-A/non-B carrier. McGreal reasoned that without such a test any plan to release non-A/non-B research veterans would carry with it the risk that non-A/non-B carriers would be among those returned to the wild where they would come in contact with and quite possibly infect other animals. It is quite clear that Dr. McGreal was correct in her observation that there is no way of definitely determining whether an animal is a non-A/non-B carrier. Dr. Alfred Prince, the discoverer of non-A/non-B hepatitis and widely regarded as the preeminent authority on that form of hepatitis, testified at his deposition that the carrier state in chimpanzees who have been infected with non-A/non-B hepatitis is quite common. Dr. Prince stated that minimally 25 to 50% and possibly as high was 75 or even 100% of animals remain non-A/non-B carriers indefinitely after they are no longer actively diseased. Dr. Prince expressly confirmed that, as Dr. McGreal had stated, there is no test to identify the viral agent which causes non-A/non-B hepatitis, and indeed Immuno's own Dr. Eder coauthored an article acknowledging that the virus lacks "generally accepted serological and morphological markers" (4 *Hepatology Mag* 510 [1984]). There is then no real issue as to the accuracy of the factual premise underlying McGreal's concern that undetected non-A/non-B carriers might be released. Immuno urges, however, that although there is no test for the non-A/non-B virus, it is possible to ascertain whether an animal is still infectious, and that it would, therefore, have been possible to prevent the release of infectious chimpanzees, thus removing any risk of the spread of non-A/non-B hepatitis. But, here again, Immuno's plan would seem to have been completely unrealistic, for the test Immuno claims it would have performed to determine whether its former research subjects were still infectious was to innoculate a healthy animal with the blood of a research veteran and see whether the healthy chimp developed hepatitis symptoms. Dr. Prince termed this procedure "expensive," "laborious" and "wasteful," and observed that it would involve the infection of healthy chimpanzees. He noted that the procedure's many drawbacks made its use rare. Under these circumstances, McGreal can hardly be faulted for not assuming that Immuno would necessarily perform the innoculation procedure on every one of the many chimps it intended to return to the wild. Without any practical means of screening for non-A/non-B carriers, there was certainly some risk rea-

sonably to be perceived in a rehabilitation scheme such as that proposed by Immuno.

The extent of the risk following from the release of non-A/non-B carriers was a matter of opinion. No one could foresee precisely what the consequences would be. As Dr. Prince noted in his deposition testimony and in his letter to the editor responding to Dr. McGreal's letter, there was much that was not known concerning the prevalence and duration of the carrier state and the transmissibility of the non-A/non-B virus among chimpanzees. Certainly, Dr. McGreal did not invite a contrary impression when she spoke of what "could well" happen if carrier animals were released.

We turn now to McGreal's statement that, "[C]apture of wild chimpanzees for research is in clear violation of the World Health Organization's 1982 statement on the procurement of primates for biomedical research." The record shows that the World Health Organization and the Ecosystem Conservation Group[3] had indeed issued a policy statement on the use of nonhuman primates for biomedical purposes. The statement observed in relevant part:

"A total of 76 primate taxa are currently considered endangered, vulnerable or rare by IUCN. Since these taxa are either in serious decline or already at very low and precarious population levels, any exploitation of them threatens their continued survival. Therefore, the ECG and WHO strongly recommend that:

"(1) endangered, vulnerable and rare species be considered for use in biomedical research projects only if they are obtained from existing self-sustaining captive breeding colonies (i.e. in captive breeding, all animals are required to be at least F2 generation)."

Obviously, Immuno's proposal which, even in its revised form, involved the use of animals listed as "vulnerable" taken from the wild, and which, in any event, did not contemplate the use of animals obtained from "existing self-sustaining captive breeding colonies" would have run afoul of this policy statement. McGreal's assertion was quite simply true. It is not deprived of its validity by Immuno's efforts to magnify it into

---

3. The Ecosystem Conservation Group (ECG) is made up of members from the United Nations Educational, Scientific and Cultural Organization (UNESCO), the United Nations Environment Program (UNEP), the Food and Agriculture Organization of the United Nations (FAO), and the International Union for Conservation of Nature and Natural Resources (IUCN).

an accusation of illegality. Viewed fairly, McGreal's assertion does no more than state accurately that Immuno's proposal was not consistent with the policy which had been strongly recommended by the World Health Organization.

In the McGreal letter's penultimate paragraph, it is stated that there are over 1,000 chimpanzees in captivity and that these should be sufficient to meet legitimate research requirements. Dr. Eibl of Immuno conceded in his deposition testimony that Dr. McGreal's estimate of the number of chimpanzees in captivity was most probably correct. He also apparently conceded that it was a matter of opinion whether that number was, as Dr. McGreal claimed, adequate to meet legitimate research needs. But even if the concession had not been made it would be hard to view the assertion as anything but opinion. It would have been plain to the Journal's readers that McGreal's notion of what was a legitimate requirement for chimpanzees was bound to be very limited indeed. McGreal was, in fact, well known for her general disapproval of most research involving chimpanzees; for her the welfare of the animals was the predominant concern and her assessment of the legitimacy of research requirements was bound to reflect that concern. No one would have understood her statement— "[T]hese animals [the estimated 1,000 in captivity] should be enough to supply any legitimate requirements for chimpanzees"—as the product of an objective and dispassionate evaluation of biomedical research needs. In any case, McGreal did not say, as Immuno now finds it advantageous to claim, that Immuno's requirements were not legitimate, only that to the extent that they were legitimate they could be met without resorting to wild chimpanzee populations. This meaning, which we do not think defamatory, is reinforced in the last paragraph of the letter where McGreal acknowledges the importance of hepatitis research but urges at the same time that "a way can and must be found to solve this problem [the problem of hepatitis] without recourse to the dwindling populations of wild chimpanzees." It is interesting to note that McGreal's position as to how legitimate research needs should be met was not fundamentally different from that of the World Health Organization in its above-quoted statement. Indeed, if anything, McGreal's position was the more moderate one since she did not, like the World Health Organization, recommend that research subjects be limited to second generation captive bred chimps which were exceedingly scarce, but

simply advocated that the chimps not be obtained from the wild.

■ The comments attributed to Moor-Jankowski in the New Scientist article do not require extensive comment. Moor-Jankowski's somewhat colorful use of the expression "scientific imperialism" to describe the proposed Immuno project, the salient features of which had been discussed earlier in the article, was nothing more than a way of expressing a disapproving opinion of what Immuno evidently wished to do. Precisely what "scientific imperialism" is is far from clear. It is one of those " 'loosely definable' " or " 'variously interpretable' " kinds of expressions which cannot support an action for defamation. *(See, Ollman v Evans, supra,* 750 F2d, at 980.)* Manifestly, it would be an altogether pointless exercise to have a jury determine whether Immuno had in fact practiced "scientific imperialism". The statement does not lend itself to verification and cannot, therefore, be regarded as one of fact. *(See, supra,* at 981; *see also, Buckley v Littell,* 539 F2d 882, 895, *cert denied* 429 US 1062.)* As for Moor-Jankowski's other comments in the New Scientist article, namely, that Immuno's attempt to circumvent treaty restriction would reflect poorly on other researchers and that the World Health Organization would soon find it necessary to take a position on the Immuno project, these too were readily identifiable statements of opinion. The limited factual basis for these opinions was set forth in the course of the article and it would seem highly unlikely that any reader would have mistaken them for assertions of fact.

■ As can be seen from the foregoing, of the many statements cited by the plaintiff in this ill-focused libel suit, there was not one that was actionable. Without exception, the statements at issue were either opinion absolutely privileged under the First Amendment, or statements which the plaintiff utterly failed to show susceptible of being proved false. Indeed, most of the factual statements claimed by the plaintiff to be defamatory were, on the record before us, demonstrably true! Given these rather striking and fundamental deficiencies in plaintiff's case, it is unnecessary for us to reach the issue of malice with which plaintiff seems to have been preoccupied. Large portions of the record are taken up with testimony and documents through which the plaintiff attempts to show that Moor-Jankowski bore ill-will towards Immuno and that Moor-Jankowski considered Immuno a competitor whose research efforts he wished to undermine. Plaintiff urges that the alli-

ance between Moor-Jankowski and Shirley McGreal, people who had previously had strong differences and apparently had not always held each other in high regard, had no other purpose but to smear Immuno's reputation. None of this evidence, however, has any relevance to the dispositive issues in this case. Regardless of what the defendant's motives may have been, what was said was not actionable and the law of libel was not properly used by the plaintiff as an instrument for its suppression.

Accordingly, the order of the the Supreme Court, New York County (Beatrice Shainswit, J.), entered August 17, 1987, which, *inter alia,* denied the motion of defendant Moor-Jankowski for summary judgment, should be reversed, on the law, to the extent appealed, the motion granted, and the complaint dismissed, with costs.

The motion by prospective *amici curiae* World Wildlife Fund, Sierra Club *et al.,* and the New York Civil Liberties Union for leave to appear and file briefs should be granted.

SULLIVAN, ROSS, ROSENBERGER and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on August 17, 1987, unanimously reversed, on the law, to the extent appealed, the motion granted, and the complaint dismissed. Appellant shall recover of respondent $75 costs and disbursements of this appeal. The motion for leave to appear and file briefs is granted.