DALLAS PARKS, Respondent, v GEORGE STEINBRENNER et al., Appellants.

First Department, July 23, 1987

## APPEARANCES OF COUNSEL

*Barry G. Saretsky* of counsel *(Bower & Gardner,* attorneys), for appellants.

*Sheldon Bunin* of counsel *(Alexander, Ash, Schwartz & Cohen, P. C.,* attorneys), for respondent.

## OPINION OF THE COURT

ELLERIN, J.

This action for defamation brings into play one of the most colorful of American traditions—the razzing of the umpire.

The plaintiff, Dallas Parks, served as an American League baseball umpire from 1979 through 1982. He alleges that he was defamed by George Steinbrenner, principal owner of the New York Yankees, when Steinbrenner, on August 29, 1982, issued a press release, excerpts of which were published in newspapers throughout the United States, criticizing Parks' abilities as an umpire. The press release, which was issued after the Yankees had played a two-game series with the Toronto Blue Jays in Toronto, Canada, on August 27th and 28th, at which Parks officiated, reads as follows:

"Judging off his last two days' performance, my people tell me that he is not a capable umpire. He is a member of one of the finest crews umpiring in the American League today, but obviously he doesn't measure up.

"We are making no excuse for the team's play this season, but this weekend our team has had several key injuries and for umpire Dallas Parks to throw two of our players out of ballgames in two days on plays he misjudges is ludicrous.

"This man, in my opinion, has had it in for the Yankees ever since I labeled him and several of the umpires as 'scabs' because they worked the American Leagues games in 1979 during the umpires' strike.

"Parks must learn that the word scab is a commonly used phrase. It is in no way meant as a personal insult. However, because he worked during the strike for baseball management does not mean he should be protected by them and annually given a job he is not capable of handling."

This less than complimentary critical assessment appears to

have been the "final straw" in the rhubarb that had long simmered between the umpire and the owner and resulted in commencement of the instant action, against Steinbrenner and the Yankees, wherein plaintiff seeks damages for defamation on the ground that the press release falsely impugned his ability, competence, conduct and fairness as a baseball umpire.

In subsequently moving, pursuant to CPLR 3211 (a) (7), to dismiss the complaint for failure to state a cause of action, defendants argued that the press release represented a nonactionable constitutionally protected expression of opinion. While Special Term found that the statement was "clearly expressed as an opinion", it nevertheless held that the complaint sufficiently pleaded a cause of action in defamation because the press release did not "set forth an adequate statement of facts which would support that opinion". The court concluded that the only fact contained in the statement —i.e., that Parks expelled two Yankee players from the game —did "not in any way support the opinions proffered" that plaintiff was incompetent and biased and, further, that no factual basis was set forth for the conclusory assertion that plaintiff misjudged plays.

· We disagree with Special Term's assessment of the press release in question and find that it constituted a constitutionally protected expression of pure opinion.

In all defamation cases, the threshold issue which must be determined, as a matter of law, is whether the complained of statements constitute fact or opinion. If they fall within the ambit of "pure opinion", then even if false and libelous, and no matter how perjorative or pernicious they may be, such statements are safeguarded and may not serve as the basis for an action in defamation. *(Steinhilber v Alphonse,* 68 NY2d 283, 289; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380-381, *cert denied* 434 US 969.) A nonactionable "pure opinion" is defined as a statement of opinion which either is accompanied by a recitation of the facts upon which it is based, or, if not so accompanied, does not imply that it is based upon undisclosed facts. Alternatively, when a defamatory statement of opinion implies that it is based upon undisclosed detrimental facts which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and actionable. *(Steinhilber v Alphonse, supra,* at 289-290.) Similarly actionable as a "mixed opinion" is a defama-

tory opinion which is ostensibly accompanied by a recitation of the underlying facts upon which the opinion is based, but those underlying facts are either falsely misrepresented or grossly distorted. *(Silsdorf v Levine,* 59 NY2d 8, *cert denied* 464 US 831; *Chalpin v Amordian Press,* 128 AD2d 81.)

Determining whether particular statements, or particular words, express fact or opinion is ofttimes an exercise beset by the uncertainties engendered by the imprecision and varying nuances inherent in language. While mechanistic rules and rigid sets of criteria have been eschewed as inappropriate vehicles for the sensitive process of separating fact from opinion, reference to various general criteria has been found helpful in resolving the issue. Predominant among these is that the determination is to be made on the basis of what the average person hearing or reading the communication would take it to mean, and that significance is to be accorded the purpose of the words, the circumstances surrounding their use and the manner, tone and style with which they are used. *(Steinhilber v Alphonse, supra,* at 290-291.) An approach which was favorably commented upon in the *Steinhilber* case is that set forth by Judge Starr in his plurality opinion in *Ollman v Evans* (750 F2d 970 [DC Cir], *cert denied* 471 US 1127) which enunciates four factors which should generally be considered in differentiating between fact and opinion. They are as summarized in *Steinhilber (supra,* 68 NY2d, at 292) as follows: "(1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact' *(Ollman v Evans, supra,* at p 983 * * *)."

These factors have particular relevance to the statement here in issue which must be evaluated within the broader social context of a baseball club owner versus an umpire, and especial attention should be accorded to whether there exist any customs and conventions regarding the status of an umpire in the great American pastime which would signal to readers that what is being read is likely to be opinion not fact.

A brief historical perspective[1] indicates that there are indeed such relevant customs and conventions. While it was an honor to be selected as the esteemed umpire in the early days of baseball, when it was known as a "gentleman's sport", that position changed markedly with the growth of professionalism in the 1870's, when the position of the umpire concomitantly declined and a lengthy history of abuse took hold. Albert G. Spalding, one of the pioneering promoters of the game, is reported to have said that by harassing umpires, fans were exercising their democratic right to oppose tyrants. Baltimore manager Ned Hanlon, one of the leading strategists of the 1890's, observed that "it is impossible to prevent expressions of impatience or actions indicating dissent with the umpire's decision" and advised umpires to accept verbal abuse as part of their role. Thus, a half-century later everyone readily understood the lighthearted acceptance of General Douglas MacArthur's reported statement, on his return to America, that he was proud to have protected American freedoms, like the freedom to boo the umpire.[2]

Judges, too, have expressed their acceptance of this American tradition. In dismissing a minor league general manager's defamation action on other grounds, a Federal court noted that harsh insults, especially those directed at an umpire, are accepted commonplace occurrences in baseball. *(King v Burris,* 588 F Supp 1152, 1157 [D Colo 1984].) The contemporary view of a baseball umpire was perhaps best summed up by the Supreme Court of North Carolina in an action brought by a minor league umpire charging a team with failing to provide adequate safety and police protection from a fan who physically assaulted him. *(Toone v Adams,* 262 NC 403, 137 SE2d

---

1. *See, for example,* Voigt, America Through Baseball, ch 11 (1976); Voigt, American Baseball (1964); Smith, Baseball In America (1961).

2. Since the late nineteenth century, the baseball umpire has had to tolerate extraordinary verbal abuse. Indeed, on occasion he has been the target of unlawful physical attacks by players and fans. For example, in 1940, one fan jumped out of the stands at Ebbets Field to "flatten" umpire George Magerkurth with his fists. When the fan's photograph appeared in the newspaper the next day, it was learned that he had risked more than the exercise of his "right to question the umpire"—the attacker was a paroled felon who was properly returned to jail for violating his parole. Yet, Magerkurth, perhaps because his assailant had been imprisoned for the attack, never pressed charges for the assault. In the 1985 World Series, pitcher Joaquin Andujar attacked umpire Don Denkinger on the field of play. Andujar was promptly fined and suspended. As in ordinary life, so in sports, the physical integrity of players, umpires and fans are protected against unlawful intrusion.

132, 10 ALR3d 435.) The court there aptly stated: "For present day fans, a goodly part of the sport in a baseball game is goading and denouncing the umpire when they do not concur in his decisions, and most feel that, without one or more rhubarbs, they have not received their money's worth. Ordinarily, however, an umpire garners only vituperation—not fisticuffs. Fortified by the knowledge of his infallibility in all judgment decisions, he is able to shed billingsgate like water on the proverbial duck's back" *(supra,* 262 NC, at 408, 137 SE2d, 136).

When Steinbrenner's remarks are viewed in this context, it is clear that they would be perceived by the average reader as a statement of opinion, and not fact. The negative characterizations of the plaintiff umpire as "not capable", that "he doesn't measure up", that he "misjudges" plays and that his decision to "throw two of our players out of ballgames" was "ludicrous" are readily understood to be the kind of "rhetorical hyperbole" that generally accompany the communication of displeasure at an umpire's "calls". While the subjective and emotional character of such sentiments is commonly recognized and construed as "opinion" rather than fact, that view is expressly emphasized upon a reading of the entire press release with its qualifying phrases of "my people tell me" and "in my opinion". Moreover, on its face, and from its tone, it is immediately evident that the statement represents the view of the owner of an embattled baseball team who is obviously chafing at "the team's [poor] play this season", which has been exacerbated by a weekend of injuries and ejections of players, and who is venting his frustrations in the venerated American tradition of "baiting the umpire". Indeed, even if the assertions in the statement implying that plaintiff was incompetent and biased in performing his duties were to be viewed as statements of fact, it is questionable whether they could be construed as defamatory—i.e., exposing the plaintiff to public contempt, ridicule, aversion and disgrace and inducing an evil opinion of him in the minds of right thinking persons *(Rinaldi v Holt, Rinehart & Winston, supra,* 42 NY2d, at 379)—in light of the generally "critical" attitudes which baseball umpires, in any event, ordinarily appear to inspire in both the game's fans and its participants.

Although acknowledging that the statement in issue was "clearly expressed as an opinion", Special Term held that it was actionable because the accompanying underlying facts

were found by Special Term not to adequately support the opinions proffered. That one may dispute the conclusions drawn from the specified facts is not, however, the test. So long as the opinion is accompanied by a recitation of the facts upon which it is based it is deemed a "pure opinion" and is afforded complete immunity even though the facts do not support the opinion. The rationale for this broad protection of an expression of opinion accompanied by a recitation of the facts upon which it is based is that the reader has the opportunity to assess the basis upon which the opinion was reached in order to draw his or her own conclusions concerning its validity. *(Silsdorf v Levine, supra,* 59 NY2d, at 13-14.)

Here, the statement appears to set forth the facts upon which defendant Steinbrenner's opinions are based. He notes that plaintiff threw out two Yankee players in two days on plays which he opines, in best partisan tradition, the umpire "misjudged". He also points to his calling Parks a "scab" during a prior umpires' strike as the reason for his belief that the umpire "has had it in for the Yankees ever since". Moreover, and of great significance, is that there is no indication or implication that his opinions as to plaintiff's competence, or the propriety of his calls, are based on some other undisclosed derogatory facts, unknown to the reader, which support those opinions. Even read in a neutral context, dehors the dynamics of the baseball world and its customs, the press release in every respect falls within the orbit of an expression of "pure opinion" which is constitutionally protected *(Steinhilber v Alphonse, supra; Silsdorf v Levine, supra).*

The reverence which the First Amendment accords to ideas has properly resulted in the determination that, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas". *(Gertz v Robert Welch, Inc.,* 418 US 323, 339-340.) Those competing ideas about baseball's arbiters will undoubtedly continue to abound aplenty both on the playing fields and in the sports columns, albeit not in the courtroom.

Accordingly, the order, Supreme Court, Bronx County (Alfred J. Callahan, J.), entered May 9, 1986, which denied the defendants' motion to dismiss the complaint and supplemental complaint for failure to state a cause of action, should be reversed, on the law, and the complaint dismissed, without costs.

KUPFERMAN, J. P., CARRO, KASSAL and WALLACH, JJ., concur.

Order, Supreme Court, Bronx County, entered on May 9, 1986, unanimously reversed, on the law, and the complaint dismissed, without costs and without disbursements.