OPINION OF THE COURT
Kaye, J.
This appeal concerns application of the "settled rule that expressions of an opinion 'false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions’ ”. (Steinhilber v Alphonse, 68 NY2d 283, 286.) Settled though the rule may be, the line separating protected expressions of opinion from actionable assertions of fact has proved elusive. In this case, the primary — and vehemently contested — dispute between the parties concerns the proper category for a letter to the editor of a scientific journal.
I.
This libel action arises out of a letter to the editor published in the Journal of Medical Primatology in December 1983. The letter was written by Dr. Shirley McGreal, chairwoman of the International Primate Protection League (IPPL), an organization known for its vigorous advocacy on behalf of primates, particularly those used for biomedical research. Defendant Dr. J. Moor-Jankowski, a professor of medical research at New York University School of Medicine and director of the Laboratory for Experimental Medicine and Surgery in Primates of the New York University Medical Center, is cofounder and editor of the Journal.
The subject of McGreal’s letter (reprinted at 145 AD2d, at 118-120) was a plan by plaintiff, Immuno AG. — a multinational corporation based in Austria that manufactures biologic products derived from blood plasma — to establish a facility in Sierra Leone for hepatitis research using chimpanzees. McGreal’s letter was critical of Immuno’s proposal on a number of grounds: (1) that the motivation for the plan was to avoid international policies or legal restrictions on the importation of chimpanzees, an endangered species; (2) that it could decimate the wild chimpanzee population, as capture of chimpan *554 zees generally involved killing their mothers, and efforts at returning experimental animals to the wild (as plaintiff proposed) were of questionable success; and (3) that returning the animals to the wild risked spreading hepatitis to the rest of the chimpanzee population. McGreal stated that the current population of captive chimpanzees should be adequate to supply any legitimate requirements.
The letter was prefaced by an editorial note written by defendant that set out its background. Identifying McGreal as chairwoman of IPPL, the note stated that the Journal had received the initial version of the letter in January 1983 and had submitted it to plaintiff for comment or reply. Plaintiff had acknowledged receipt of the letter in February, offering no comment but that it was referring the matter to its New York lawyers. Thereafter, plaintiff’s lawyers wrote that Mc-Greal’s statements were inaccurate, unfair and reckless, and requested the documents upon which the accusations were based, threatening legal action if the letter were printed before plaintiff had a meaningful opportunity to reply. The editorial note went on to state that the editors had advised plaintiff’s attorneys that they should obtain the documentation directly from McGreal, and extended the period for plaintiff’s reply by two months. The letter was published nearly a year after its receipt, after articles had appeared in the Austrian press apparently confirming much of what Mc-Greal had written, and after receiving no further word from plaintiff or its lawyers.
In addition to the McGreal letter that is the focus of contention, plaintiff complains that it was defamed by comments made by defendant quoted in an article entitled "Loophole May Allow Trade in African Chimps” that appeared in the New Scientist magazine shortly before McGreal’s letter was published. Defendant is quoted as saying that the supply of captive chimpanzees was sufficient for research, describing defendant’s attempts to circumvent controls on endangered species as "scientific imperialism,” and warning that they will "backfire on people like me involved in the bona fide use of chimpanzees and other primate animals” for research.
In December 1984, plaintiff commenced this lawsuit against Moor-Jankowski and seven other defendants, including Mc-Greal and the publishers and distributors of the New Scientist and the Journal of Medical Primatology. All the defendants save Moor-Jankowski settled with plaintiff for what the mo *555 tion court described as "substantial sums,” and the complaint was dismissed as to them. After extensive discovery, defendant moved for summary judgment. Supreme Court granted the motion to the extent of dismissing a claim for prima facie tort. It denied the motion as to the defamation claims, ruling that the statements at issue were statements of fact and, regardless of whether plaintiff was a public figure, there were triable issues of fact concerning whether defendant acted with actual malice in making or publishing the statements.
On defendant’s appeal, the Appellate Division unanimously reversed, granted defendant’s motion and dismissed the complaint. The court held that all of the comments attributed to defendant in the New Scientist article were expressions of opinion that could not, as a matter of law, support an action for defamation. As to the McGreal letter, the Appellate Division held that for the most part it too was a constitutionally protected expression of opinion. To the extent that it contained statements of a factual nature, the Appellate Division examined each statement meticulously, and concluded from the voluminous record not only that plaintiff had failed to adduce evidence of falsity but also that all such factual assertions were demonstrably true.
With respect to the comments attributed to defendant in the New Scientist article, we now affirm the Appellate Division order for the reasons stated by that court (145 AD2d 114, 143). With respect to the McGreal letter, we also affirm the Appellate Division order, but on a somewhat different analysis.
II.
However difficult the philosophical or practical problem of disentangling assertions of fact from statements that do not imply or assert factual matters ("opinion” in the parlance of defamation law analysis), it is settled that pure opinion— however misguided or vituperative — is entitled to the absolute protection of the State and Federal constitutional free speech guarantees (see, Steinhilber v Alphonse, 68 NY2d, at 289, supra; Ollman v Evans, 750 F2d 970, 974-975, n 6 [DC Cir] [en banc], cert denied 471 US 1127).
This distinction between fact and opinion, which grew out of the common-law doctrine of fair comment, was elevated to constitutional status, in the interpretation of State and Federal courts, by the Supreme Court’s widely cited dictum in *556 Gertz v Robert Welch, Inc. (418 US 323, 339-340), that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. Neither the intentional lie nor the careless error materially advances society’s interest in 'uninhibited, robust, and wide-open debate on the public issues.’ ” (Quoting New York Times Co. v Sullivan, 376 US 254, 270.)
It has been suggested that one reason for the distinction between fact and opinion is that statements of fact have greater potential for influence and hence are likelier to damage reputation than mere expressions of opinion, which are more readily discounted by the reader or listener. (Note, Fair Comment, 62 Harv L Rev 1207, 1213 [1949].) The Gertz passage suggests two additional rationales. The first concerns institutional competence: unlike an assertion of fact, which may be proven true or false by objective standards, an idea or opinion is not susceptible to such measurement by courts and juries.
Perhaps closest to the roots of the distinction in the doctrine of fair comment is the second thread of the Gertz dictum— that unlike assertions of fact, ideas or opinions merit protection for their role in a competition or marketplace of ideas, as stimulants of "uninhibited, robust and wide-open debate on the public issues.” The more limited common-law defense of fair comment which, among its other elements, required that the criticism concern a matter of legitimate public interest, was similarly concerned with public debate. It protected the right to comment on public affairs and ensured the public’s access to important information (see, Note, The Fact-Opinion Determination in Defamation, 88 Colum L Rev 809, 811 [1988]; Titus, Statement of Fact Versus Statement of Opinion — A Spurious Dispute in Fair Comment, 15 Vand L Rev 1203 [1962]). This central concern informs not only its foundation but also the law that has grown out of Gertz.
In reviewing the underpinnings for the distinction between fact and opinion, moreover, it is above all important to bear in mind that the exercise is not merely one in semantics. Several courts and commentators have criticized as inadequate any analysis that does not give central significance to the role played by the challenged statements in public debate, or to the "core value” of the free speech guarantee (see, e.g., Ollman *557 v Evans, 750 F2d, at 996 [Bork, J., concurring], supra; Janklow v Newsweek, Inc., 788 F2d 1300, 1302-1303 [8th Cir]; Note, The Fact-Opinion Determination in Defamation, op. cit., at 831-840).
While eschewing adherence to any rigid criteria for resolving the legal question of whether a statement is one of fact or opinion, this court has recognized as helpful the four factors identified by the plurality in Ollman (750 F2d, at 979, supra): "(1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.’ ” (Steinhilber v Alphonse, 68 NY2d, at 292, supra.) Attention to these factors enables a court to perform its essential task in determining whether a given statement expresses opinion, which is to ascertain "what the average person hearing or reading the communication would take it to mean.” (Id,., at 290.)
We next apply these legal principles to the facts at hand.
III.
In performing the essential task of ascertaining what the average person reading McGreal’s letter would take it to mean, we begin our analysis (as did Ollman) with an examination of the context of the challenged remarks. Unlike Steinhilber and its predecessors, what is at issue in this case is a special type of expression — a letter to the editor.
Broadly speaking, there are three major types of journalistic activity (see, Franklin, Libel and Letters to the Editor: Toward an Open Forum, 57 U Colo L Rev 651 [1986]). The first is originating or investigative activity, such as news reporting. Second is commentary or criticism, which generally is protected as opinion. The third function many publications serve is to transmit the views of readers, by providing a public forum known as letters to the editor.
There is a manifest difference between ordinary reporting and letters to the editor. As a rule, such letters are not *558 published on the authority of the newspaper or journal. In this case, for instance, defendant’s prefatory editorial note signaled that the letter was to be given only the weight its readers chose to accord McGreal’s views; such reservations may be generally understood even when letters are not accompanied by any editorial note. Thus, any damage to reputation done by a letter to the editor generally depends on its inherent persuasiveness and the credibility of the writer, not on the belief that it is true because it appears in a particular publication.
Most importantly, for many members of the public, a letter to the editor may be the only available opportunity to air concerns about issues affecting them. "When a citizen is troubled by things going wrong, he should feel free to 'write to the newspaper’: and the newspaper should be free to publish his letter. It is often the only way to get things put right” (Slim v Daily Tel., [1968] 2 QB 157, [1968] 1 All ER 497, 503, quoted in Pollnow v Poughkeepsie Newspapers, 107 AD2d 10, 16 [Titone, J.], affd on other grounds 67 NY2d 778). The availability of such a forum is important not only because it allows persons or groups with views on a subject of public interest to reach and persuade the broader community but also because it allows the readership to learn about grievances, both from the original writers and from those who respond, that perhaps had previously circulated only as rumor; such a forum can advance an issue beyond invective. Finally, at the least, the public may learn something, for better or worse, about the sort of person or group that would write such a letter (see, Franklin, op. cit., at 663-664).
Thus, in determining how the average person would view McGreal’s letter, we take into account that it is a letter to the editor and that "the common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion.” (145 AD2d, at 129.)
Passing from the broader social setting to the immediate context of the letter, we note that the common expectation regarding letters to the editor has particular pertinence here.
As the Appellate Division observed, the Journal of Medical Primatology is directed at a highly specialized group of readers — medical doctors, researchers and the medical and science libraries of academic institutions; the average reader is thus *559 likely not a novice in the field of medical primatology, but brings a "well-developed understanding of the issues facing biomedical researches using primates as research subjects.” (145 AD2d, at 129.) The prefatory note additionally called particular attention to the circumstances surrounding the letter, pointing up that this was Dr. McGreal’s view, and that plaintiff’s attorneys considered her statements to be "wholly inaccurate and reckless” and "not a fair comment” on plaintiff’s proposed project.
The letter itself related to a public controversy regarding use of live animals belonging to endangered species, including chimpanzees, in animal experimentation and research. Mc-Greal (a known animal rights activist) and IPPL (whose very name broadcasts its point of view) were fully identified to readers of the letter. The letter made clear that its purpose was to voice the concerns of this partisan group in order "to draw this situation to the attention of interested parties.”
Thus, like the broader social setting of McGreal’s letter, its immediate context would induce the average reader of this Journal to look upon the communication as an expression of opinion rather than a statement of fact.
Nor can it be said from the specific language, viewed in its totality, that the body of the letter conveyed statements intended to be understood and accepted by the average reader of this publication as gospel. As a practical matter, it is hard to conceive that any published statement could be wholly devoid of factual reference. Like most — if not all — letters to the editor, McGreal’s was provoked by a particular state of affairs, and her letter set out its point of reference. That factual reference point of course must not be false (see, Silsdorf v Levine, 59 NY2d 8), but in the present case the Appellate Division’s extensive analysis amply establishes that plaintiff raised no triable issue of fact as to the falsity of the threshold assertions of McGreal’s letter.
Beyond that threshold reference point, from start to finish the body of the letter communicated the accusations of a group committed to the protection of primates and openly critical of plaintiff’s project. Within that framework, the writer presumed and predicted as to what "appeared to be” or "might well be” or "could well happen” or "should be” the motivations for and future consequences of plaintiff’s proposed chimpanzee research program, plainly relating matters of opinion rather than flat-out, measurable statements of fact. *560 Speculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel (see, Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, cert denied 434 US 969).
We reject plaintiff’s invitation to engage any further in what would in essence be "a Talmudic parsing” of the length and breadth of this letter, as if "with a philosophical enterprise or linguistic analysis. Ours is a practical task, with elemental constitutional values of freedom looming large as we go about our work. And in that undertaking, we are reminded by Gertz itself of our duty 'to assure to the freedoms of speech and press that "breathing space” essential to their fruitful exercise.’ ” (Ollman v Evans, 750 F2d 970, 991, supra.)
Finally, while structuring our analysis to fit within the hardened categories of "fact” and "opinion,” we additionally look beyond them to the core values protected by the State and Federal Constitutions. The public forum function of letters to the editor is closely related in spirit to the "marketplace of ideas” and oversight and informational values that compelled recognition of the privileges of fair comment, fair report and the immunity accorded expression of opinion. These values are best effectuated by according defendant latitude to publish a letter to the editor on a matter of legitimate public concern — the letter’s author, affiliation, bias and premises fully disclosed, rebuttal openly invited — free of defamation litigation. A publication that provides a forum for such statements on controversial matters is not acting in a fashion "at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected” (Garrison v Louisiana, 379 US 64, 75), but to the contrary is fostering those very values.
While concluding that the McGreal letter is within the protection of the constitutional free speech guarantee, two additional matters bear mention.
First, we agree with plaintiff that had defendant deliberately incited McGreal to have a defamatory letter to the editor published, no privilege would shield him from liability. Although defendant discussed the contents of McGreal’s letter with her and made suggestions about its contents, plaintiff’s allegations of a deliberate effort, or conspiracy, to smear its reputation are entirely conclusory, and therefore do not preclude summary judgment in defendant’s favor.
*561 Second, this case — having already engendered thousands of pages of a litigation record and "substantial” settlements from all other defendants — exemplifies that the " 'threat of being put to the defense of a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself ”. (Karaduman v Newsday, Inc., 51 NY2d 531, 545.) We have therefore stressed the particular role and importance of summary judgment, where appropriate, in libel cases (see also, 145 AD2d, at 127-128). That chilling effect can be especially severe for scholarly journals, such as defendant’s, whose editors will likely have more than a passing familiarity with the subject matter of the specialized materials they publish; if required as to every line of a reader’s expressed viewpoint to meet the standard of Chapadeau v Utica-Observer Dispatch (38 NY2d 196), they may as a practical matter have little alternative to lengthy litigation or substantial settlement. In such instances, hypertechnical parsing of a possible "fact” from its plain context of "opinion” loses sight of the objective of the entire exercise, which is to assure that — with due regard for the protection of individual reputation — the cherished constitutional guarantee of free speech is preserved.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order affirmed, with costs.