DON KING PRODUCTIONS,
INC., Plaintiff,

v.

James "Buster" DOUGLAS, John P.
Johnson, Golden Nugget, Inc., and
the Mirage Casino–Hotel, Defendants.

No. 90 Civ. 1203 (RWS).

United States District Court,
S.D. New York.

June 29, 1990.

OPINION

SWEET, District Judge.

Don King Productions, Inc. ("DKP") moves for partial summary judgment against defendants James "Buster" Douglas ("Douglas") and John P. Johnson ("Johnson") striking these defendants' affirmative defense of unconscionability and dismissing their counterclaims for slander and intentional infliction of emotional distress. The motion is granted for the reasons set forth below.

### The Parties and Prior Proceedings

Facts and past proceedings relating to this action are set forth in the court's prior opinion of May 18, 1990 742 F.Supp. 741 (the "May 18 Opinion") which determined the parties' cross-motions for summary judgment, familiarity with which is assumed. The present motion, which followed the submission of defendants' answer and counterclaims and their responses to interrogatories in connection therewith, originally was made returnable on June 19, 1990. That same day several additional motions *in limine* were argued and, with the parties' blessing, argument of this partial summary judgment motion was adjourned until June 22 to provide the parties additional preparation time. The motion was argued on that date, after which a supplemental submission was received from DKP on June 27, 1990.

### Standards Applicable to Summary Judgment Motions

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir. 1988). All ambiguities are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Ramseur v.*

Sidley & Austin, New York City, for plaintiff; Robert W. Hirth, of counsel.

Hunterton & Naylor, P.C., Las Vegas, Nev., for defendants James "Buster" Douglas and John P. Johnson; C. Stanley Hunterton, of counsel.

Warshaw Burstein Cohen Schlesinger & Kuh, New York City, for defendants The Mirage Casino–Hotel and Golden Nugget, Inc.; Robert Fryd, of counsel.

*Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

However, courts should not be reluctant to grant summary judgment in appropriate cases. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), thereby permitting courts to avoid "protracted, expensive and harassing trials." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

*The Unconscionable Contracts Defense*

■ Douglas and Johnson plead as an affirmative defense that the contracts they entered into with DKP are unconscionable. Under New York law (which previously has been found to govern the validity of these contracts, *see* May 18 Opinion at 759), a determination of unconscionability

> requires a showing that the contract was both procedurally and substantively unconscionable *when made*—i.e., "some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'"

*Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824, 828 (1988) (citations omitted and emphasis supplied). The factual contentions set forth in the Douglas/Johnson interrogatories to support the unconscionability defense—that the Tokyo conduct of King was unconscionable, that King is a powerful promoter, and that exclusive, extendable terms of the contracts are unreasonably favorable to King—are as a matter of law insufficient.

■ The Douglas/Johnson contention that the contracts "became unconscionable" *after* their inception owing to King's conduct during the Tokyo fight is unavailing, as the underlined language in *Gillman* illustrates. The doctrine of unconscionability implicates the circumstances and terms of a contract at the time of formation—not the parties' subsequent performance under it. *See State v. Avco Financial Service of New York, Inc.,* 50 N.Y.2d 383, 390, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075, 1079 (1980) (referring to "circumstances existing at the time of the making"). The Tokyo performance by King is, of course, relevant to whether King breached his obligations of good faith and fair dealing under the contracts, an issue discussed at length in the May 18 Opinion and which has been reserved for trial to a jury. That conduct has, however, absolutely no bearing on the defense of unconscionability, which relates to substantive and procedural fairness of a contract "when made." *Gillman,* 73 N.Y.2d at 10, 537 N.Y.S.2d at 791, 534 N.E.2d at 828.

Douglas/Johnson next contend that King so dominates promotion of heavyweight fights that the Douglas–King contracts are inherently procedurally unconscionable. That assertion, if true, sounds more probative of an antitrust claim for monopolization than it is demonstrative of the particularized showing of an unfair bargaining process that is requisite to the defense of unconscionability. Douglas/Johnson make no allegation here that deceptive or high-pressure tactics were employed in concluding the contracts, that contract terms were concealed in fine print, or that there was a gross asymmetry in the experience and education of the parties, each of whom was represented by counsel throughout the course of their arms-length negotiations. *See* May 18 Opinion at 747; *cf. Gillman,* 73 N.Y.2d at 11, 537 N.Y.S.2d at 791, 534 N.E.2d at 828 (identifying relevance of these and other factors to establishment of procedural unfairness).

At least as stated in the responses to the contention interrogatories, the unconscionability defense does not here implicate its primary use as "a means with which to protect the commercially illiterate consumer beguiled into a grossly unfair bargain by a deceptive vendor or finance company." *Marvel Entertainment Group, Inc. v. Young Astronaut Council,* No. 88–5141, 1989 WL 129504 (S.D.N.Y. October 27,

1989), 1989 U.S. Dist. LEXIS 12803, at 11 (*quoting Gillman v. Chase Manhattan Bank, N.A.*, 135 A.D.2d 488, 491, 521 N.Y. S.2d 729, 732 (2d Dep't 1987), *aff'd*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988)). Without some definite allegation of a defect in the contract negotiation process apart from King's stature in the boxing field, which alone does not suggest "inequality so strong and manifest as to shock the conscience and confound the judgment," *id.* (quoting *Christian v. Christian*, 42 N.Y.2d 63, 71, 396 N.Y.S.2d 817, 823, 365 N.E.2d 849, 855 (1977)), defendants have failed to create an issue of procedural unconscionability requiring resolution by jury.

The contention that the contracts require Douglas to fight exclusively for DKP for the extendable terms of such contracts, which could amount to the rest of the boxer's professional life, equally fails to satisfy the requirement of substantive unconscionability. Only in "exceptional cases" is "a provision of [a] contract ... so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman*, 73 N.Y.2d at 12, 537 N.Y.S.2d at 792, 534 N.E.2d at 829 (omitting citations); *see also Marvel Entertainment, supra*, 1989 WL 129504, 1989 U.S. Dist. LEXIS at 11 (citing *Christian v. Christian*, 42 N.Y.2d 63, 71, 396 N.Y.S.2d 817, 823, 365 N.E.2d 849, 855 (1977) (terms must be "such as no [person] in his senses and not under delusion would make on one hand, and no honest and fair [person] would accept on the other.").

Douglas and Johnson fail to make any proffer as to what makes this term of their contract so exceptional as to fit within in the line of cases referred to in *Gillman*,

and they cite to no case considering or holding an exclusive services contract unconscionable on grounds of duration, notwithstanding the invitation to address that issue contained in the May 18 Opinion.[1] The court therefore declines to revisit its prior legal determinations that the contract durational terms were definite in nature and the contracts were supported by sufficiently-definite price consideration to induce Douglas' promise to fight exclusively for DKP. *See* May 18 Opinion at 761–64. The unconscionability defense accordingly shall be stricken, there having been no proffer or allegation sufficient to establish either its procedural or substantive elements.

*Slander*

The counterclaim for slander is predicated upon the following statements alleged to have been made by King: (i) after the eighth round, King's words "to the effect that the fight should be stopped and Mike Tyson be declared the winner"; (ii) shortly after the fight at close of which Douglas had been declared the winner, remarks by King that he was protesting Douglas' victory over Tyson and that "the first knockout obliterated the second knockout"; and (iii) the observations of King quoted in the margin, reportedly made a tape-recorded mini press-conference also held after the fight:

Here's a fact. Mike Tyson knocked out James Buster Douglas ... And the count went to thirteen. So now ... And the referee I ran to immediately upon saying this. I issued a protest to Mr. Mendoza and Mr. Jose Sulaiman ...

∴ There is a grave misjustice here. There's an injustice here if the decision holds that Mike Tyson is knocked out.[2]

---

**1.** May 18 Opinion at 763–64 n. 22 ("The parties have not briefed ... whether in the context of a personal services contract such a [commercial lifetime] term might be so 'unduly harsh or one-sided' as to warrant withholding ... [enforcement] of a restrictive negative covenant") (case citations omitted).

**2.** The passage sets forth King's words as reported in an article appearing in The National Sports Daily. *See* Opinion of June 18, 1990 (describing circumstances of mini press-confer-

ence). The article additionally quotes King, asked why a protest was not issued after the eighth round, as follows:

I urged that. I said, 'Stop it now because there is a mistake here.' You know what I mean? But I don't run the show. All I can do is voice a protest and then go through the normal procedures of trying to put a protest down. I tried to stop it and have somebody go in there and say " 'Stop this fight' because the fight is over.' "

DKP seeks dismissal of the slander counterclaim on grounds that (1) King's statements were constitutionally protected expression and (2) Douglas and Johnson have failed to allege facts that would establish King knew his statements to be false or uttered them with reckless disregard for their truth or falsity.

DKP's argument that King's statements are protected opinion was advanced without benefit of review of the Supreme Court's recent teaching on the subject, *Milkovich v. Lorain Journal Co.,* — U.S. —, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which holds the First Amendment contains no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich,* — U.S. at —, 110 S.Ct. at 2705. Accordingly, whatever constitutional protection is available for King's statements must derive from the framework of privileges and protections recognized in that decision.[3] These are considerably broader than might be imagined from a reading of popular reports of the opinion privilege's demise.

The *Milkovich* decision reassures "that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.,* — U.S. at —, 110 S.Ct. at 2706. Equally protected are "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual," by which reference the Court intends to carry forward the privileged status historically accorded "'rhetorical hyperbole.'" *Id.,* (quoting *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 53–55, 108 S.Ct. 876, 879, 880–82, 99 L.Ed.2d 41 (1988)).

The present inquiry therefore demands determination of whether King's statements, to the extent they are opinions, (1) address matters of public concern, (2) are expressed in a manner that implies a factual connotation that is provably true or false and (3) if so, whether they reasonably can be interpreted as intended to convey actual facts about a person.[4]

---

**3.** There is some suggestion in decisions of the New York Court of Appeals that, in New York, the fact/opinion defamation dichotomy descends from the New York State Constitution as much as the First Amendment (from which it has so recently been disinherited), *see, e.g., Immuno A.G. v. Moor–Jankowski,* 74 N.Y.2d 548, 555, 549 N.Y.S.2d 938, 549 N.E.2d 129 (1989) ("it is settled that pure opinion—however misguided or vituperative—is entitled to the absolute protection of the State and Federal constitutional free speech guarantees"), but it is not at all clear (*see id.,* 74 N.Y.2d at 555–56, 549 N.Y.S.2d 938, 549 N.E.2d 129, attributing elevation of opinion to Supreme Court's dictum in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1983)), that the New York court's state-constitutional recognition of this distinction has ever been enunciated in a manner sufficiently independent to survive scrutiny under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). *Cf. Milkovich,* — U.S. at —–— n. 5, 110 S.Ct. at 2701–02 n. 5 (holding Ohio decision under review by Court lacked adequate statement of reliance on independent Ohio state law-based opinion privilege). Accordingly, without further elucidation of the point by the parties (who silently have assumed that New York law governs this defamation claim), no reliance is placed here upon a *per se* privilege for opinion that may now, or someday, have an independent source in the New York State Constitution.

**4.** As DKP is a non-media defendant, application of these standards requires a holding that all speakers, regardless of status as members of the organized press, are entitled to this First Amendment protection. Although the Supreme Court has not yet finally resolved the issue, the First Amendment itself would appear to admit of no hierarchy of speakers, nor would its ends be served by judicially valuing speech by criterion of source. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 2953, 86 L.Ed.2d 593 ("First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech") (White, J., concurring in judgment); *id.,* 105 S.Ct. at 2957 ("such a distinction is irreconcilable with the fundamental First Amendment principle that 'the inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source. . . .'") (Brennan, J., dissenting) (joined by Marshall, J., Blackmun, J., and Stevens, J.) (quoting *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 7677, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978)). *Accord Garcia v. Board of Education,* 777 F.2d 1403, 1410 (10th Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986) ("First Amendment protection should not depend on whether that criticism is in the form of speech by a private individual or publication by the institutional press"). New York courts have accorded defamation protections to non-media defendants without elaborating whether the basis for

As to the first step, King's comments related to matters of public concern. Although boxing matches do not arouse concern among some portions the populace, sports-minded boxing fans are a sufficiently large and devoted segment of the public to warrant finding "public interest" in the comments of a leading boxing promoter addressing the outcome of the title fight for the world heavyweight championship. *Cf. Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254, 267 (E.D.Pa.1977), *aff'd,* 595 F.2d 1265 (3d Cir.1979) (en banc) ("[P]ublic's interest in professional football is [not] important to the commonweal or to the operation of democratic society in the same sense as are political and ideological matters. However, the fabric of our society is rich and variegated … [Interest] in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression."); *Holt v. Cox Enterprises,* 590 F.Supp. 408 (N.D.Ga.1984) (noting in context of defamation action brought by ex-football player the public's longstanding interest in rivalry between Alabama and Georgia Tech teams); *Bell v. Associated Press,* 584 F.Supp. 128 (D.D.C.1984) (considerable public interest, concern, and controversy with respect even to off-the-field conduct of professional athletes). *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 136, 87 S.Ct. 1975, 1981, 18 L.Ed.2d 1094 (1967) (plurality opinion) (football coach public figure in view of popular interest in the sport).

It is necessary therefore to determine whether any of King's statements are of a semantic form that either directly permits assessment of their truth or falsity, or that reasonably implies factually verifiable content. The first statements of concern are those allegedly made by King at the end of the eight round to persons at ringside to the effect that the fight *should* be stopped, which were coupled with his alleged protest of the fight's continuance. These are not factual propositions about Douglas but rather, expressions of King's desires. Such exhortations to others to act in furtherance of a certain sought result ascribe no factual characteristics to Douglas and are therefore not actionable.

The propositions that "the first knockout obliterated the second knockout" and "Mike Tyson knocked out James Buster Douglas" do appear literally to be factual statements capable of verification, and, indeed, to be verifiably false to the extent the words are presumed to be *descriptive* statements of the rulings of the referee or of other ringside officials made at the time of the bout. Such a reading, however, divorces the remarks from the context in which they were uttered, and, in the process, badly distorts their semantic content.

The words in question are alleged to have been spoken by King sometime after he witnessed the conduct of the timekeeper and referee in the eighth and tenth rounds and after the completion of the fight at which Douglas had been declared the victor in the ring. No reasonable person could understand King to have been disputing (falsely) the actual facts that the referee had ruled Douglas to have resumed fighting in the eighth round before expiration of the count or that, at ringside, Douglas was recognized as the victor at the conclusion of the fight. Rather, the reasonable contextual understanding of King's hyperbole (and indeed, the meaning ascribed to them by Douglas/Johnson in this litigation), is as criticism of and challenge to the correctness and fairness of the official ringside determinations. As King stated: "There is a grave misjustice here. There's an injustice here if the decision holds that Mike Tyson is knocked out."

These "statements … cannot reasonably [be] interpreted as stating actual facts" that Douglas intends to prove are slanderously false, *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2706 (quotation omitted); they do express King's sentiment about (and, perhaps, his will to change) an acknowledged, and factually undisputed, state of

doing so is found in the First Amendment or in the state constitution. *See, e.g., Parks v. Steinbrenner,* 131 A.D.2d 60, 520 N.Y.S.2d 374 (First

Dept.1987) (privilege of hyperbolic speech extended to owner of baseball team).

the world. By themselves, then, these remarks are unactionable because, although they are fact-laden, the principal implicated fact—that Tyson had been treated as "knocked out" by the officials at ringside—is both indisputably true and nondefamatory of Douglas.

■ King's criticisms of the fight rested, however, on two other facts, one explicitly stated and the other implied. The expressed factual underpinning for the claim that Tyson should have been credited with a knockout, not a knockdown, is the assertion that the referee's eighth round count lasted longer than boxing rules provide. That statement is apparently both disputed and falsifiable. If false, it might well serve as a predicate for a defamation suit by the referee, since it was he who was being accused of misfeasance in delivering the count.[5] Nevertheless, it cannot be a slander of Douglas because the remark self-evidently does not "stat[e] actual facts about [that] individual." *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2706 (quotations omitted).

■ In fact, none of King's *explicit* comments target the character or performance of Douglas. One might think therefore that none could reasonably be interpreted as stating defamatory facts about him. Under *Milkovich* 's test, however, the court is not free to ignore implicit assertions of fact necessarily embedded in an expression of opinion. *See Milkovich,* —— U.S. at ——, 110 S.Ct. at 2705 ("expressions of 'opinion' may often imply an assertion of objective fact.") Here, such an implied factual proposition—that Douglas would not have been capable of resuming the fight in the eighth round had the referee's count not lasted too long—necessarily underpinned King's assertion that Tyson should have been credited with a knockout during the eighth round.

Unlike the noted explicit factual proposition, which concerned the behavior of the referee, this implied assertion does address the subject of Douglas' own professional performance and so may not as lightly be disregarded as nondefamatory. *See, e.g., Four Star Stage Lighting, Inc. v. Merrick,* 56 A.D.2d 767, 392 N.Y.S.2d 297 (1st Dept. 1977) (words affecting person in his profession, trade or business by imputing incapacity, unfitness or want of any necessary qualifications are libelous); *but cf. Parks v. Steinbrenner,* 131 A.D.2d 60, 520 N.Y.S.2d 374, 377 (1st Dept.1987) (questioning whether words critical of umpire's performance could be construed as defamatory under standard that words must tend to "expos[e] the plaintiff to public contempt, ridicule, aversion and disgrace [or] induc[e] an evil opinion of him in the minds of right-thinking persons") (citing *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977)).

Nevertheless, it is equally nonactionable because it is not an assertion "sufficiently factual to be susceptible of being proved true or false." *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2707. Whether or not Douglas might have been able to rise from the canvas in time had the referee accelerated the count is genuinely unknowable. That is not because evidence has ceased to exist or cannot be located which might have definitively established the answer, *see Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 779, 106 S.Ct. 1558, 1565, 89 L.Ed.2d 783 (1986) (noting difficulty plaintiffs may encounter in meeting burden of proving falsity of defamatory words in states that provide reporters benefit of shield laws permitting their refusal to divulge sources), but because the question is hypothetical, inherently calling for speculation about what might have happened in the past had certain other past events transpired differently. *Cf. Milkovich,* —— U.S. at ——, 110 S.Ct. at 2707 (holding question of whether petitioner actually committed act of perjury is "an objectively verifiable event," not a "subjective assertion").

---

5. *But see Parks v. Steinbrenner,* 131 A.D.2d 60, 520 N.Y.S.2d 374, 377 (1st Dept.1987) (noting honored tradition of "umpire baiting" and holding negative characterizations of umpire's decisions to be " 'rhetorical hyperbole' " entitled to protection).

Although there may be room for better and worse assessments of whether Douglas' pace of recovery from Tyson's punch would have been sufficient to bring him to his feet seconds earlier, in the present instance no appraisal is susceptible to being proved false in a court of law. King's implicit, pessimistic assessment was therefore no more than a guess (perhaps a bad one, at that) about a conceivable but non-existent state of the world. Given the transparently hypothetical nature of the question, persons receiving the benefit of King's implied wisdom on the subject could not reasonably regard it as anything more definite than that. Therefore, as a matter of law under *Milkovich*, no reasonable fact-finder could conclude that this implication of King's opinion of the eighth round was to be taken as "asserted fact." [6]

Accordingly, for the reasons stated and under the First Amendment protections as formulated in *Milkovich*, no statement of King's is both unprotected by the First Amendment and yet actionable as slanderous. In view of that determination, it is unnecessary to consider whether Douglas, a public figure within the meaning of *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), "voluntarily exposed [himself] to increased risk of injury from defamatory falsehood," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974), has pleaded facts sufficient to demonstrate actual malice. The counterclaim for slander is dismissed.

### Emotional Distress

■ Under New York law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress," *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1216–17 (1978) (citing Restatement (Second) Torts § 46(1)), but "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*, 402 N.Y.S.2d at 993, 373 N.E.2d at 1217 (citing Restatement's Comment D).

Where the parties' relationship is defined by a business or employment context, courts have been particularly reluctant to recognize such claims predicated upon a defendant's expression of opinion about professional capabilities or status of the plaintiff. Thus, in *Van Swol v. Delaware Valley Central School District*, 117 A.D.2d 962, 499 N.Y.S.2d 274 (3d Dep't 1986), alleged comments by a school superintendent that a particular teacher was unfit for the profession, intended to "isolate plaintiff from his colleagues, cause loss of his job, and cause permanent impediment on his ability to practice his profession," were deemed nonactionable. The court held that even

> [c]onstruing the allegations of the amended complaint most favorably to plaintiff ..., they fail to allege facts sufficient to meet the strict standard which is cognizable as a cause of action for the intentional infliction of emotional distress. [Defendant's] alleged unflattering opinions of plaintiff's professional abilities do not suffice to establish a cause of action....

*Id.*, 499 N.Y.S.2d at 275–76; *see also Kirwin v. New York State Office of Mental Health*, 665 F.Supp. 1034, 1040 (E.D.N.Y. 1987) (allegations that plaintiff was accused of improper and dishonest activities at work and given unjustifiably poor evaluations did not constitute outrageous conduct as matter of law); *Murphy v. American Home Products Corp.*, 112 Misc.2d 507, 447 N.Y.S.2d 218, 219–220 (Sup.Ct.N.Y.Co.1982), *aff'd*, 88 A.D.2d 870, 451 N.Y. S.2d 770 (1st Dept 1982), *aff'd*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (dismissing distress claim despite allegations that plaintiff was transferred and demoted for reporting fraud at his company, told he

---

**6.** That conclusion is buttressed by, but reached independently of, the fact that King allegedly caused to have published and replayed, at a time proximate to his words, a video tape of the eighth round, thereby presenting to those present the objective data from which might be drawn subjective answers to the hypothetical such as his own.

would never advance, ultimately discharged and ordered to leave; forcibly escorted from building when he returned next day to pick up his belongings; and had his possessions dumped in street two weeks later when he returned, at instructed time, to pick up his belongings); *Brink's Inc. v. City of New York*, 533 F.Supp. 1123, 1135 (S.D.N.Y.1982) (allegations that employee was demoted, harassed, and verbally abused failed to state claim for intentional infliction of emotional distress).

As explained in the Restatement,

[t]he rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express unflattering opinion, and some safety valve must be left through which irascible tempers may blow off ... steam.

*Restatement (Second) of Torts, quoted in Moye v. Gary*, 595 F.Supp. 738, 739 (S.D.N.Y.1984) (dismissing employee's action for emotional distress predicated on supervisor's alleged comments that she was a "poor woman" and a "fag").

■ The multitude of cases such as *Murphy* demonstrate that in the professional or employment context the edges may be particularly rough; the remedies for rough words and behavior in these contexts—if any—are ordinarily contractual or statutory (such as pursued by Douglas and Johnson elsewhere in this action in arguing that King's conduct has breached Douglas' contracts), for only in the most extreme and outrageous case does a cause of action for intentionally hurt feelings lie. *See Murphy*, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236, 448 N.E.2d at 90 (disapproving use of tort of infliction of emotional distress to subvert traditional employment contract doctrines).

The contention that King said or implied that Douglas was not the deserving champion, although deserving of further examination and proof as a claim for breach of the contractual duty of good faith and fair dealing, falls far short of the degree of extremity and incivility required to plead intentional infliction of emotional distress, as comparison with a case such as *Murphy* should make manifest. As a matter of law, King's alleged conduct is an insufficient predicate for a cause of action for intentional distress, even assuming the worst of intentions on his part. This counterclaim shall be dismissed.

*Conclusion*

The motion for partial summary judgment is granted. The defense of unconscionability shall be stricken and the counterclaims for slander and intentional infliction of emotional distress shall be dismissed.

Submit order.

It is so ordered.